**Tom HAMMON, Plaintiff,**

v.

**DHL AIRWAYS, INC., Defendant.**

**No. C–1–95–1039.**

United States District Court,
S.D. Ohio,
Western Division.

Aug. 13, 1997.

David Gerard Torchia, Tobias & Kraus, Cincinnati, OH, for Tom Hammon.

Linda L. Woeber, Montgomery, Rennie & Johnson, Cincinnati, OH, for DHL Worldwide Express.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DLOTT, District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. # 13). For reasons set forth below, the Defendant's Motion is hereby **GRANTED**.

### I. UNDISPUTED FACTS AND PROCEDURAL HISTORY

#### A. Undisputed Facts

The Plaintiff, Thomas Hammon ("Hammon"), was employed by DHL Airways, Inc. ("DHL"). He began working for DHL in August of 1989, where he worked until November of 1993. Hammon was hired as a First Officer in the Metro Aircraft. He subsequently transferred to the Lear Jet as a First Officer and finally to the Metro Aircraft as a Captain. (Hammon Aff ¶ 2.) Hammon performed these duties without incident. In August of 1993, Hammon began ground school training for Boeing 727s. (Hammon Dep. at 16.) Hammon's simulator training started on September 29, 1993. (Hammon Dep. at 17.) After three simulator sessions, Hammon became sick and took a medical leave of absence until November 3, 1993. (Hammon Dep. at 18.) Upon his return Hammon had difficulty in responding to emergency situations during simulator training. On November 12, 1993, Mike Mahoney verbally attacked Hammon for failing to activate a fire bell. Hammon's failure resulted in a simulator crash. (Hammon Dep. at 28–29.)

Hammon's incident with Mike Mahoney became a pivotal point for Hammon. He subsequently reported that this incident was the cause of his loss of confidence. (Hammon Dep. at 33.) He began "second guessing every move" he made. (*Id.*) The subsequent week Hammon continued to "go backwards". (Hammon Dep. at 34.)

On his way to work on November 20, 1993 Hammon experienced what later would be described as an anxiety or panic attack. (Hammon Dep. at 35.) Before his training simulator session that day, Hammon spoke with Jim Pebler ("Pebler"), Hammon's flight instructor, and told him "this is not working for me." (Hammon Dep. at 36.) "If I have to, I'm going to resign." (*Id.*) Hammon did not have his training session. Instead, Pebler took him out to dinner to discuss his concerns. During dinner Hammon told Pebler that he "intended to resign." (Hammon Dep. at 38–40; Pebler Dep. at 45–50.) Pebler urged Hammon not to resign. Pebler suggested that Hammon complete the last two training sessions and then take the test flight. (*Id.*) At the end of the evening Pebler told Hammon that he would set up a meeting with Pete Blessing ("Blessing"), Director of Training. (Hammon Dep. at 40.)

On November 22, 1993, Hammon met with Joe Sarsfield ("Sarsfield"), the Chief Pilot for the Boeing 727s, instead of Blessing. The

meeting with Sarsfield progressed much like Hammon's dinner with Pebler. (Hammon Dep. at 42–45.) Hammon related to Sarsfield that it was not working out and that he had no confidence left. Sarsfield responded by asking Hammon if changing instructors would help him. Hammon replied by saying, "I might as well go ahead and resign. This is just not going to work. I might as well go ahead and just resign." (Hammon Dep. at 42.) Sarsfield followed up by saying, "you are one of the ones I want to keep." (*Id.*) Sarsfield acknowledged that Hammon was having a difficult time. (Hammon Dep. at 43.) Sarsfield urged Hammon to think about his decision more "and get some sleep." (*Id.*) Again, Hammon told Sarsfield, "this is not working. I'm going backwards ... instead of getting closer to ready—being ready for a check ride, I'm getting further away." (*Id.*) Hammon asked what his options were as they related to his training on the 727s. Sarsfield at that point urged Hammon to go ahead and finish the two remaining training sessions then take the check ride. (Hammon Dep. at 44.) The conversation continued, "Joe, it's not working. We've seen that ... I've had 14 hours in the sim and I'm going backwards." (*Id.*) Hammon asked again, "what options do I really have?" (*Id.*) Sarsfield repeated, "really, take the next two training sessions and go on. Take your check ride." (*Id.*) Hammon responded, "[if] those are my only options, then we might as well follow this course." (Hammon Dep. at 45.)

> And he originally said, Tom, take until Saturday to think about this. And he said, no, that's too long. I can't do that for you. He said, think about it and he said, give me a call Wednesday morning. He said, if you change your mind, give me a call Wednesday morning—or Wednesday at noon is what it was.
>
> Give me a call Wednesday at noon, and if I don't hear from you, I will go in and I will take this to Jim, i.e., meaning he would go in and talk to Jim and then here would come the meeting with personnel.

(Hammon Dep. at 45–46.)

Sarsfield stated that when Hammon left the situation was clear. If Hammon changed his mind, decided not to resign, he would call Sarsfield by Wednesday. (Sarsfield Dep. at 43.) Sarsfield fully expected Hammon to change his mind and call the next morning. (Sarsfield Dep. at 44.) Hammon never called Sarsfield. He stated that he expected to hear from Sarsfield or personnel. Hammon waited a week to hear from someone at DHL. He expected to be called in "[f]or an exit interview or let's see what's going on here and explain my options." (Hammon Dep. at 46.)

On November 26, 1993 he went to see Dr. George Kreyling ("Kreyling"), the doctor that DHL uses for its FAA physicals. (Hammon Dep. at 47; Kreyling Dep. at 7.) Hammon stated that he "felt terrible." (Hammon Dep. at 47.) He thought that it could be medical; he just wanted "to alleviate this internal pressure that's building up." (*Id.*) During his appointment with Dr. Kreyling, Hammon reported he had been a nervous wreck since September. (Kreyling Dep. at 7.) Kreyling reported that Hammon was, "very anxious, [had] difficulty concentrating, [and] was detached." (Kreyling Dep. at 8–9.) Kreyling took Hammon's blood pressure and drew blood to test for any "chemical abnormalities." After Kreyling's examination he determined Hammon was "physically upset and ... needed to see a psychiatrist." (Id.)

Kreyling called Joe Sarsfield at home. The exact content of the conversation is not clear. However, Kreyling was able to recall two topics of the discussion. First, Kreyling related that he felt Hammon was not able to perform his duties because of his anxiety. Second, he recalls that there was a question of whether Hammon had quit his job at DHL. (Kreyling Dep. at 10–11.) In a letter dated December 3, 1993 and addressed to Joe Sarsfield, Kreyling wrote; "If possible, I recommend that Tom Hammon be granted a one month leave of absence. He is experiencing emotional problems at this time. It is my intent to refer him to a psychiatrist for evaluation and treatment." (Kreyling Dep. Ex. 1.)

This was the last contact Kreyling had with Hammon. Kreyling gave Hammon the names of a few psychiatrists. Hammon be-

gan psychological treatment with a Dr. Mulderig. Hammon continued to see Dr. Mulderig on and off until May of 1996. (Hammon Dep. at 108.)

The next contact Hammon had with anyone from DHL was with Sarsfield. Hammon attempted to call Sarsfield after his appointment with Dr. Kreyling on November 26, 1993. Sarsfield returned Hammon's call after several days. Sarsfield had already begun to process Hammon's resignation. Sarsfield told Hammon that, "this matter is out of my hands." (Hammon Dep. at 51–52.) Sarsfield further advised Hammon that he could apply for reinstatement within thirty days by writing a letter to Dave Reeve. (Hammon Dep. at 53.) In a letter dated December 21, 1993, addressed to David Reeve ("Reeve") Hammon requested that his "verbal resignation" be reconsidered. (Pl.'s Mem. Supp. Summ. J., doc. # 13, at Ex. B.) Reeve believed that Hammon would not be able to perform the duties necessary to be a pilot. On December 30, 1993 Reeve called Hammon and told him that his request for reinstatement was denied. (Reeve Dep. at 66–67.)

**B. Procedural History**

Hammon filed a charge of discrimination with the EEOC on July 11, 1994. (Hammon Compl. ¶ 15 ) On August 28, 1995 the EEOC issued Hammon a right to sue letter. (Hammon Compl. ¶ 16 ) Hammon subsequently filed a complaint in this Court, which is the subject of this Motion for Summary Judgment. Hammon alleges that DHL's conduct violated his rights under the ADA, the FMLA, and ERISA. Hammon seeks reinstatement, compensatory damages, punitive damages, attorneys fees and expenses, and all other equitable relief to which the Plaintiff may be entitled.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment[ ] as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Summary judgment is not appropriate if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment asserting that the opposing party may not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989). ("In other words, the movant could challenge the opposing party to 'put up or shut up' on a critical issue. After being afforded sufficient time for discovery, ... if the [nonmoving party] did not 'put up,' summary judgment [is] proper.") On those issues for which it shoulders the burden of proof, the moving party must make a showing that is " 'sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984)) (emphasis omitted). For those issues where the moving party will *not* have the burden of proof at trial, the movant must "point[ ] out to the district court ... that there is an absence of

evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The non-moving party then must make a showing sufficient to establish a genuine dispute of fact with respect to that element. *Id.* This showing must amount to more than pointing once again to the pleadings—the movant "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 (quoting *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Thus, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2510–11 (citations omitted).

### III. HAMMON'S RESIGNATION

At the outset the Court must determine if Hammon's conduct of November 23, 1993 resulted in his resignation or if a genuine dispute of material fact exists which would preclude the Court from so finding. After carefully reviewing the evidence presented to it, the Court finds that the undisputed facts establish that, as a matter of law, Hammon did resign on November 23, 1993 from his position as pilot at DHL.

#### A. Resignation in Writing

■ First, Hammon alleges that he took no "affirmative steps" after his conversation with Sarsfield to effectuate his resignation. Namely, Hammon points to the absence of a letter of resignation and an effective date. The Court finds that "affirmative steps" are not necessary to effectuate a resignation.

In *State ex rel. Waldman v. Burke,* 152 Ohio St. 213, 216, 88 N.E.2d 578 (1949), the Ohio Supreme Court addressed a similar situation and found that an employee had resigned when no writing existed and where the employee had taken no affirmative action to resign. The case involved an employee who was on an extended sick leave and who requested an extension of his leave. The employer informed the employee by letter that the request was denied and that if the employee failed to appear for work on the date his original leave was to end, this con-

duct would be viewed "as a termination" of his employment. When the employee failed to show for work after the end of the original leave period, the employer treated the employee's inaction as a resignation. The court found that the employer properly treated the employee's conduct as a "constructive resignation." *Id.* at 215, 88 N.E.2d 578.

In much the same way Hammon constructively resigned his position at DHL. In responding to Hammon's repeated verbalizations of his intention of resigning, Sarsfield urged Hammon to finish up his training and take the check flight. Sarsfield told Hammon to call him if he changed his mind. Based on Hammon's own testimony, Sarsfield did not state that someone from DHL would contact him to verify his resignation. Nor did Sarsfield tell Hammon he needed to submit his resignation in writing to be effective. Hammon understood that if he failed to call Sarsfield by Wednesday at noon it would be taken that he had not changed his mind. Not changing his mind meant he still intended to resign This Court finds that Sarsfield appropriately understood Hammon's failure to call as a "constructive resignation."

#### B. Hammon's Letter of December 21, 1993

■ In a letter dated December 21, 1993, addressed to Reeve, Hammon wrote:

This letter is to formally inform you of my request to reconsider my verbal resignation under duress and to apply for reinstatement at a later date. Medical tests and evaluations found and confirmed that I was not at full capacity for a time before, time of, and later due to intense job related stress and anxiety.

(Doc. # 13, Ex. B.)

In his deposition Hammon explained that he used the word "duress" because he "was not sharp ∴ . . . struggling for survival." (Hammon Dep. at 77.) He used the word to describe his subjective feelings of pressure and anxiety. He did not use the term to insinuate that Sarsfield pressured him into resigning. Thus, the resignation was verbalized by Hammon's own volition. This Court finds Hammon's explicit request to reconsid-

er his "verbal resignation" to be the strongest evidence of an effective resignation in this case.

The Court for the reasons detailed above, hereby finds that as a matter of law Hammon resigned from DHL on November 23, 1993 (the date of the Sarsfield conversation).

## IV. ADA CLAIM

### A. Prerequisites of a Successful Claim Under the ADA

#### a. Established Framework for Employment Discrimination Cases

Under the established framework for deciding employment discrimination cases set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), a plaintiff establishes a prima facie case by proving several elements of his or her claim. The elements necessary to establish a prima facie case for each of the plaintiff's claims are set forth in more detail below.

Once a plaintiff has established a prima facie case, the burden of production shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action taken against the plaintiff *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 883 (6th Cir.1996) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824)

If the defendant carries the burden of production by articulating a legitimate, non-discriminatory reason, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but were merely pretext for illegal discrimination. *Kocsis*, 97 F.3d at 883 (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981)).

#### b. Prima Facie Elements of an ADA Claim

Hammon alleges that DHL violated his rights under the Americans with Disabilities Act (ADA). First, Hammon claims that DHL failed to reasonably accommodate him, as required by the ADA, when it refused to grant him a leave of absence. Second, Hammon claims that DHL failed to reasonably accommodate him when it refused to rescind his resignation.

The ADA, 42 U.S.C. §§ 12101–12213, provides in part:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). "Section 12112(b) defines discrimination under Section 12112(a) as, among other things, denying employment opportunities to an 'employee ... with a disability, if such denial is based on the need of [the employer] to make reasonable accommodation to the physical or mental impairments of the employee or applicant'" *Rollison v. Gwinnett County*, 865 F.Supp. 1564, 1572 (N.D.Ga.1994) (citing 42 U.S.C. 12112(b)(5)(B)).

For Hammon to establish a prima facie case of employment discrimination under the ADA he must show that: (1) he is disabled, (2) he is otherwise qualified for the position, with or, without reasonable accommodation, (3) he suffered an adverse employment decision, (4) DHL knew or had reason to know of his disability, and (5) the position remained open. *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1185 (6th Cir.1996). Hammon has failed to establish a prima facie case for at least two reasons.

First Hammon has not shown that he suffered an adverse employment decision. As discussed above, Hammon resigned from his position at DHL. Because he resigned by his own volition, he could not have suffered "an adverse employment decision." Only if Hammon could show that he was constructively discharged could he meet his burden of showing adverse employment action was taken against him.

For Hammon to successfully claim that he was "constructively discharged" he must present evidence to show that " 'working conditions would have been so difficult or un-

pleasant that a reasonable person in the employee's shoes would have felt compelled to resign." ' *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 887 (6th Cir.1996) (quoting *Held v. Gulf Oil Co.,* 684 F.2d 427, 432 (6th Cir.1982)).

■ Hammon has not presented this Court with any genuine dispute of material fact regarding the issue of "constructive discharge." The Court recognizes that the exchange between Mike Mahoney and Hammon, characterized by Hammon as a "verbal attack" was likely unpleasant. (Hammon Compl. ¶ 7.) However, this was one isolated incident. This isolated incident does not rise to the level of a "working condition" of the type discussed above. On the contrary, according to Hammon's own testimony, Pebler and Sarsfield attempted to talk him out of resigning numerous times. Sarsfield even offered to change Hammon's flight instructor. These are not hostile or unpleasant "working conditions."

■ Second, Hammon has not shown that DHL knew or had reason to know of his disability. " '[A]n employer must know about a disability before it can intentionally discriminate against an employee based on that disability. Otherwise it could not be said that the employer discriminated because of the disability.' " *Kocsis,* 97 F.3d at 881 (quoting the district court opinion); *accord Monette,* 90 F.3d at 1185. The employer must have actual knowledge of an employee's disability for an employee's claim to fall under the ADA. *See id.* An employer "knows" of a disability when an employee tells the employer of his or her "condition." *Schmidt v. Safeway Inc.,* 864 F.Supp. 991, 997 (D.Or. 1994). The employer need only know the "underlying facts" of the condition. *Id.* (the employee need not label his "condition" as a "disability").

Hammon never told DHL that he was disabled. As discussed above, according to Hammon's own testimony, he repeatedly told Sarsfield and Pebler that he was "going backwards" and that "this is not working." He discussed his lack of confidence. Hammon did not relate to DHL that he was unable to complete training as a result of a physiological or psychological condition. On the contrary, Hammon, in his own testimony, stated that he did not view his difficulties as psychological in nature until he went to see Dr. Kreyling. (Hammon Dep. at 85.) This Court finds that Hammon's expression of self-doubt and lack of confidence to his employer did not result in the employer's "knowledge" of his disability.

In sum, for the reasons discussed above, Hammon has failed to establish a prima facie case of discrimination under the ADA. Because Hammon failed to establish a prima facie case, the Court need not consider whether DHL has articulated a legitimate nondiscriminatory reason for its actions.

**B. Hammon's Request for Reasonable Accommodation**

■ Under the ADA, "the term 'discriminate' includes ... (5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). "[T]he disabled individual bears the initial burden of proposing an accommodation and showing that [the] accommodation is objectively reasonable." *Monette,* 90 F.3d at 1183.

■ Hammon alleges he requested reasonable accommodation on two occasions. First, Hammon alleges that DHL refused to reasonably accommodate him when it refused to grant him a leave of absence. As discussed in section "III" above, Hammon resigned from his position as pilot at DHL, on November 23, 1993. The earliest date Hammon may have requested a leave of absence was the date he went to see Dr. Kreyling, November 26, 1993, (*see infra* at 4). This date was after his resignation on November 23. This request is of no consequence because when Hammon resigned, his protection under the ADA ceased.

In *Gonzales v. Garner Food Services, Inc.,* 89 F.3d 1523, 1528 (11th Cir.1996) *cert. denied, Wood v. Garner Food Services, Inc.,* —— U.S. ——, 117 S.Ct. 1822, 137 L.Ed.2d 1030 (1997), the court looked to the plain language of the ADA as well as legislative history when it held that a former employee is not considered to be a "qualified individu-

al" with a disability within the meaning of the ADA. The Sixth Circuit has adopted this reasoning in *Parker v. Metropolitan Life Insurance Co.,* 99 F.3d 181, 186 (6th Cir.1996). When Hammon requested a leave of absence, he was no longer an employee of DHL. Thus, he was a former employee and not a "qualified individual" with a disability within the meaning of the ADA.

Second, Hammon alleges that DHL violated his rights protected under the ADA when it refused to rescind his resignation. Once again, in section "III" above, Hammon resigned from his position as pilot at DHL on November 23, 1993. Because he resigned he is not a "qualified individual" with a disability within the meaning of the ADA.

In short, Hammon has not established a prima facie case of disability discrimination under the ADA and therefore summary judgment is appropriate as to his ADA claim.

## V. FMLA CLAIM

■■■ Hammon asserts that DHL violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654, by terminating his employment. Section 2612(a)(1)(D) provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period for one or more of the following: ... [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." Section 2611 defines an "eligible employee" as, "an employee who has been employed for at least 12 months by the employer with respect to whom *leave is requested* under section 2612 of this title." 29 U.S.C. § 2611(2)(A)(i) (emphasis added).

Section 2612 provides in part, "the employee ... (B) shall provide the employer with not less than 30 days' notice, before the date the leave is to begin of the *employee's intention* to take leave." *Id.* at § 2612(e)(2)(B) (emphasis added). The language of § 2612(e)(2)(B) has been interpreted to speak to the notice an employee must give to an employer to be eligible for FMLA leave. *Brannon v. OshKosh B'Gosh, Inc.,* 897 F.Supp. 1028, 1038 (M.D.Tenn.1995). The *Brannon* court relied on the regulations promulgated to implement the FMLA.

29 C.F.R. § 825.303(b) provides:

The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. The employer will be expected to obtain any additional required information through informal means.

Hammon has failed to establish the existence of any genuine dispute of material fact which might enable him to bring a successful claim under the FMLA. First, when Hammon requested leave, Hammon was not an eligible employee within the meaning of the FMLA. *See* 29 U.S.C. §§ 2611(2)(A)(i), 2612(e)(2)(B). As discussed above, Hammon resigned from his position at DHL; thus, as a former employee, he was not an "eligible employee," and therefore he was not entitled to the protections afforded by the FMLA.

■■■ Second, in the time period before he resigned, Hammon's own testimony establishes that he never requested a medical leave of absence during these conversations. (Hammon Dep. at 85–87.)

In short, Hammon has not established a valid claim under the FMLA and therefore summary judgment is appropriate as to his FMLA claim.

## VI. ERISA CLAIM

■■■ Hammon also alleges that DHL, violated his rights under § 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.,* when it terminated him. Section 1140 provides:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a *participant* or beneficiary for exercising any right to which his entitled under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, ...

29 U.S.C. § 1140 (emphasis added).

Section 1132 authorizes a private cause of action for "participants." 29 U.S.C. § 1132(a)(1)(B). Section 1002 defines a "par-

ticipant" as, "any employee or former employee of an employer, ... who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees ... or whose beneficiaries may be eligible to receive any such benefit." *Id.* at § 1002(7).

Hammon has not presented enough evidence for the Court to determine whether Hammon is a "participant" as defined by the ERISA. Because this determination of whether Hammon is a "participant" is a threshold issue which must be determined before he can bring his claim in this forum, this failure to establish standing is sufficient by itself for a grant of summary judgment in favor of the Defendant. However, for the purposes of this Order, the Court will assume that Hammon is a "participant" as defined by the ERISA, and as a result, has standing to bring a claim under § 510 of ERISA. The Court so assumes only because the Court has determined that even assuming Hammon has standing, he still states no claim under ERISA. Standing remains a threshold issue which must be established by a plaintiff to assert a claim under ERISA.

 For Hammon to present a prima facie case under § 510 he must show: (1) DHL engaged in prohibited conduct, (2) for the purpose of (3) interfering with his attainment of any right to which he may become entitled under the plan. *Roush v. Weastec, Inc.*, 96 F.3d 840, 845 (6th Cir.1996). "If the plaintiff proves a prima facie case as set forth above, it is the employer's burden to 'introduce admissible evidence of a legitimate, nondiscriminatory reason for its challenged action.'" *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir.1992) (citing *Gavalik v. Continental Can Co.*, 812 F.2d 834, 853 (3d Cir.1987)).

Hammon alleges that DHL engaged in "prohibited conduct" when it "terminated" him. (Hammon Compl. ¶ 19.) As set forth in section "III" above, Hammon resigned from DHL. He was not terminated or constructively discharged. Hammon has not alleged facts to support the first prong of a prima facie case under § 510. Therefore, the Court need not consider whether he has

met the other two prongs of the prima facie case, and no burden shifting occurs.

In short, Hammon has not established a prima facie under § 510 and therefore summary judgment is appropriate as to his ERISA claim.

## VII. CONCLUSION

For all of the foregoing reasons, the Defendant's Motion for Summary Judgment is **HEREBY GRANTED.**

**LET JUDGMENT STAND IN ACCORDANCE WITH THE FOREGOING.**