IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SCOTT WOODWARD, as the Personal Representative of the ESTATE OF VIRGINIA MAY WOODWARD, SCOTT WOODWARD, in his individual capacity, and CHRISTINE WOODWARD, in her individual capacity, | ) ) ) ) ) ) ) | No. 32880-5-III |
| | ) | PUBLISHED OPINION |
| Respondents, | ) ) | |
| v. | ) ) | |
| EMERITUS CORPORATION, a Washington corporation, BROOKDALE SENIOR LIVING COMMUNITIES, INC., a Delaware corporation, FATIMAH AWAD and JOHN DOE AWAD, a marital community, MINDY ROSS and JOHN DOE ROSS, a marital community, JOHN AND JANE DOES 1-10, | ) ) ) ) ) ) ) ) ) ) | |
| Appellants. | ) ) ) | |

SIDDOWAY, C.J. — Emeritus Corporation, its affiliate, and two employees appeal the denial of their motion to compel arbitration of claims for negligence and violation of Washington's Vulnerable Adult Statute (RCW 74.34.200) brought against them by Scott

Woodward, as personal representative of the estate of his late mother, Virginia May Woodward. Acting as his mother's attorney-in-fact, Mr. Woodward had signed a predispute arbitration agreement with Emeritus at the time he signed other agreements providing for Ms. Woodward's residence and care at Richland Gardens, an assisted living facility owned and operated by Emeritus.

Emeritus drafted the operative language of the parties' agreement that "[a]rbitrations shall be administered in accordance with the procedures in effect for consumer arbitration adopted by the American Arbitration Association [AAA]." Clerk's Papers (CP) at 45. The relevant procedures adopted by the AAA contemplate that the AAA will administer the arbitration, and that a threshold procedural step will be for the AAA to review the agreement of the parties in order to determine whether it substantially and materially complies with the AAA's due process standards. If it does not, the AAA will decline to administer the arbitration and "either party may choose to submit its dispute to the appropriate court for resolution." CP at 321.

The AAA can be expected to decline to administer arbitration of the dispute between the estate and Emeritus and its codefendants (hereafter collectively "Emeritus"). While Emeritus argues that the parties' arbitration can be administered by someone else, the plain language of the AAA's Consumer Arbitration Rules (unmodified in this respect by the parties' agreement) requires AAA administration—evidently so that the AAA can apply the fast and simple procedure provided by the consumer rules to only those cases

2

for which the rules will provide due process. Where the AAA decides that due process is not assured, the rules explicitly provide that a party may litigate.

The court did not err in denying the motion to compel arbitration, which would have been futile given the undisputed expectation that the AAA would decline to administer arbitration of the estate's claims. Alternatively, we find the agreement substantively unconscionable given the nature of the claims. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

In 2012, Scott Woodward, acting as the attorney-in-fact of his mother, Virginia Woodward, signed paperwork providing for his mother's admission, residence and care at Richland Gardens, an assisted living facility owned and operated by Emeritus Corporation. Among the admissions paperwork signed by Scott[1] was a predispute arbitration agreement.

Within Virginia's first four months' residence at Richland Gardens, she was twice dropped when being moved by a staff member executing a "one-person assist," contrary to a personal care plan for Virginia that required "two-person assists" whenever she was being moved. When dropped the second time, Virginia broke her hip. She died three

---

[1] Because we refer to three members of the Woodward family, we use their first names for the convenience of the reader. We intend no disrespect.

3

months later.[2] Her death certificate lists the broken hip as a contributing cause of death.

Christine Woodward, Virginia's daughter, and Scott, individually and as the personal representative of his mother's estate, filed suit against Emeritus. The estate asserted claims for negligence and for elder abuse in violation of Washington's Vulnerable Adult Statute, RCW 74.34.200. Scott and Christine asserted claims for wrongful death.

Emeritus filed a motion to compel arbitration of the estate's claims, relying on the predispute arbitration agreement signed by Scott.[3] The estate responded by moving for an evidentiary hearing on the motion to compel arbitration, followed up by a memorandum and declarations opposing arbitration.

The arbitration agreement executed by Scott is a two-page stand-alone document titled "Agreement to Resolve Disputes by Binding Arbitration." CP at 45. It provides that if a dispute between the parties cannot be resolved through a grievance procedure, then, "unless expressly prohibited by applicable law," the following "shall be resolved exclusively by binding arbitration and not by lawsuit or resort to the judicial process":

---

[2] These facts are alleged in the Amended Complaint and are not denied in the Answer. *See* CP at 9-11 ¶¶ 16-24, CP at 241-43 ¶¶ 16-24 ("Ms. Woodward's chart and medical records speak for themselves").

[3] Emeritus moved to compel arbitration of Scott's wrongful death claim as well, but has since abandoned its argument that Scott is required by the agreement to arbitrate his claim.

any action, dispute, claim or controversy of any kind, whether in contract or in tort, statutory or common law, personal injury, property damage, legal or equitable or otherwise, arising out of the provision of assisted living services, healthcare services, or any other goods or services provided under the terms of any agreement between the Parties, including disputes involving the scope of this Arbitration Agreement, or any other dispute involving acts or omissions that cause damage or injury to either Party, except for matters involving evictions.

*Id.*

Section 3 of the agreement, captioned "Arbitration Procedure," provides that "[a]rbitrations shall be administered in accordance with the procedures in effect for consumer arbitration adopted by the American Arbitration Association." *Id.* The section then dictates the process for selection of the arbitrator, the location of the arbitration, applicable law, responsibility for the arbitrator's fee and legal expenses, and the right to enter the arbitration award as a judgment.

The estate did not dispute that Scott executed the arbitration agreement as Virginia's authorized attorney-in-fact, that it was thereby an agreement of the estate, or that the negligence and vulnerable adult claims asserted by the estate fell within the broad scope of disputes covered by the agreement. It argued that the arbitration agreement was unenforceable because it was both substantively and procedurally unconscionable. It contended that the agreement was substantively unconscionable because it required each side to pay one-half of the cost of the arbitrator, for each side to bear its own attorney fees, and because it bound Virginia to arbitration procedures that were inappropriate for

5

the type of dispute that later arose. It argued that the agreement was procedurally unconscionable because it contained internally contradictory provisions and had been presented for execution under circumstances amounting to fraud in the execution. Finally, the estate argued that it would be futile for the court to compel arbitration because the AAA would decline to administer its claims as a consumer arbitration.

A supporting declaration from Scott asserted he signed the arbitration agreement during an hour-long intake meeting with the executive director of Richland Gardens, Mindy Ross, during which she went over more than a dozen forms. He described their discussion of the arbitration agreement as follows:

> As to the arbitration agreement, I did not know what arbitration was so I asked Mindy what arbitration meant.
> Mindy told me that if "we had an issue that might have legalities involved, then we would work it out face-to-face."
> Mindy then brought up the example [of a disagreement between the Woodwards and Virginia's prior assisted living center that had prompted the move to Richland Gardens] as an example of when this would be applicable.
> Based on this explanation, I signed the arbitration agreement under the power of attorney for my mom.

*Id.* (paragraph numbers omitted).

Ms. Ross had a different version of the circumstances under which the agreement was signed. Her declaration stated that during the admission process, Scott had executed the arbitration agreement, and that "[p]rior to signing, I asked Mr. Woodward if he had any questions or concerns regarding the Arbitration Agreement, and he stated that he did

6

not." CP at 38. She also pointed out that the arbitration agreement includes an "'opt out provision'" under which it may be revoked by written notice delivered to Richland Gardens by certified mail within 15 days of signature and that Emeritus's business records contained no revocation of the agreement. *Id.*

A hearing on the cross motions for an evidentiary hearing and to compel arbitration was held on October 24. Although Emeritus had opposed the motion for an evidentiary hearing, the trial court informed the parties' lawyers at the outset of the hearing that "I really only . . . need argument on the motion to compel arbitration. That will probably resolve the other." Report of Proceedings (RP) at 3. After hearing argument, the trial court summarily denied the motion to compel arbitration, stating, "I'm not going to compel arbitration, I don't think it's appropriate." RP at 19. Emeritus appeals.

## ANALYSIS

We can affirm the trial court's order denying the motion to compel arbitration on any basis supported by the record. *LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989). Of the many issues raised in the parties' briefs on appeal, we find two to be dispositive.

First, it was foreseeable and is undisputed that the AAA would decline to administer the parties' dispute as a consumer arbitration, in which event its Consumer Arbitration Rules permit the estate to pursue its claims in court. Under the

7

circumstances, an order compelling arbitration would be futile. Second, and alternatively, we find the agreement to arbitrate to be substantively unconscionable given the nature of the estate's claims.

We begin with an overview of the Consumer Arbitration Rules and the parties' agreement, next address applicable federal and state law including the standard of review, and then turn to the two alternative bases on which we affirm the trial court.

I. *The AAA Consumer Arbitration Rules and the Parties' Agreement*

The provision of the parties' arbitration agreement that governs the procedure to be followed in arbitrating any dispute states in its entirety:

> Arbitration Procedure. Arbitrations shall be administered in accordance with the procedures in effect for consumer arbitration adopted by the American Arbitration Association. Arbitrations shall be conducted by a single arbitrator agreed to by the Parties. If the Parties cannot agree upon an arbitrator, each Party shall select a nominator, who must be engaged in the practice of professional arbitration. The two nominators shall appoint a third arbitrator who will act as the single arbitrator.
>
> Arbitrations will be held at an agreed upon location, or in the absence of such agreement, at the Community. The dispute will be governed by the laws of the state in which the Community is located. The arbitrator's fee shall be shared equally by the Parties. Each Party shall be responsible for its own legal fees. Any award by the arbitrator may be entered as a judgment in any court having jurisdiction.

CP at 45-46.

Emeritus moved to compel arbitration in October 2014. At that time, the "procedures in effect for consumer arbitration adopted by the American Arbitration

8

Association" were the AAA's Consumer Arbitration Rules ("the Rules") as amended and effective September 1, 2014. CP at 45, 231-37. Since the parties filed only partial copies of the Rules, we rely hereafter on the complete set of the Rules available at https://www. adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTAGE2021425&revision=latestreleased (last visited on January 14, 2016).

The first of the Rules, R-1, governs when they will be applied by the AAA. At R-1(a), (3) and (4), the Rules provide that if the parties have entered into a "consumer agreement" within the meaning of the Rules, the AAA will treat the Rules as a part of their arbitration agreement when the parties have provided for arbitration by the AAA and either did not specify a particular set of rules or specified a different set of rules. In making an independent determination of which of its rules should apply to a dispute, the AAA applies the Rules only to disputes arising under a "consumer agreement," which the Rules define as

> an agreement between an individual consumer and a business where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use.

R-1 at 9. The Rules list the following contracts as examples of agreements that typically meet the criteria for a consumer agreement: credit card agreements, telecommunications agreements, leases; automobile and manufactured home purchases, finance agreements;

9

home inspection contracts, pest control services; moving and storage contracts, warranties, legal funding, health and fitness club membership agreements, travel services, insurance policies, and private school enrollment agreements. R-1 at 9-10.

Examples of contracts that "typically do not meet the criteria for application of these Rules, should the contract contain an arbitration provision, include, but are not limited to": home construction and remodeling contracts, real estate purchase and sale agreements, condominium or homeowner association by-laws, business insurance policies, commercial loan and lease agreements, and commercial guaranty agreements. R-1 at 10.

Emeritus does not contend that a contract under which it provides assisted living services to an elderly patient under an individualized personal care plan falls within the AAA's definition of a "consumer agreement." But it points out that just because the AAA might not view an agreement as a "consumer agreement" within the meaning of the Rules does not mean that parties cannot select the Rules as those that will govern arbitration of future disputes under a different sort of agreement. R-1(a) provides that:

> The parties shall have made these *Consumer Arbitration Rules* ("Rules") a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association ("AAA"), and
> 1) have specified that these *Consumer Arbitration Rules* shall apply.

R-1(a) at 9 (alterations in original). "'If the parties to a contract clearly and unequivocally incorporate by reference into their contract some other document, that

document becomes part of their contract.'" *Nail v. Consol. Res. Health Care Fund I*, 155 Wn. App. 227, 232, 229 P.3d 885 (2010) (quoting *Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 801, 225 P.3d 213 (2009)). The parties' agreement in this case effectively incorporates the Rules by reference, thereby making them a part of the parties' contract. Whether the estate can successfully resist enforcement of the parties' contract on the basis of substantive unconscionability is a different issue, which we address later in the opinion.

The Rules presumptively provide for extremely limited discovery: "If any party asks or if the arbitrator decides on his or her own . . . the arbitrator may direct (1) specific documents and other information to be shared between the consumer and business, and (2) that the consumer and business identify the witnesses, if any, they plan to have testify at the hearing." R-22(a) at 20. Exhibits are required to be shared between the parties at least five business days before the hearing, unless the arbitrator sets a different exchange date. R-22(b) at 20. Otherwise, R-22(c) provides:

> No other exchange of information beyond what is provided for in section (a) above is contemplated under these Rules, unless an arbitrator determines further information exchange is needed to provide for a fundamentally fair process.

R-22(c) at 20. This provision is subject to the general command of the rule that the arbitrator "keep[] in mind that arbitration must remain a fast and economical process." R-22(a) at 20.

The Rules limit motion practice. Dispositive motions may be filed only if the arbitrator determines that the moving party has shown substantial cause that the motion is likely to succeed. R-33 at 25. Nondispositive motions may only be filed with the arbitrator's permission after the party first presents the issue in a conference call. R-24 at 21. The hearing of the arbitration "generally will not exceed one day," with an exception if "good cause" is shown. R-32(d) at 24.

Unlike other commonly used rules promulgated by the AAA that compensate arbitrators at their stated rates, the Rules dictate an arbitrator compensation rate of $1,500 per day. *Compare* R-5(a) at 14 ("[a]rbitrators serving under these Rules shall be compensated at a rate established by the AAA") *and* Rules at 34 (Costs of Arbitration, establishing $1,500 per day as the rate) *with* the AAA's Commercial Arbitration Rules and Mediation Procedures,[4] R-55(a) at 30 (an arbitrator shall be compensated at a rate consistent with his or her stated rate of compensation); the AAA's Construction Industry Arbitration Rules and Mediation Procedures,[5] R-57(a) at 36 (same); the AAA's

---

[4] https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004103& revision=latestreleased (rules amended and effective October 1, 2013) (last visited Jan. 14, 2016).

[5] https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004219& revision=latestreleased (rules amended and effective July 1, 2015) (last visited Jan. 14, 2016).

Employment Arbitration Rules and Mediation Procedure,[6] Rule 44 at 30 (an arbitrator shall charge a rate consistent with his or her stated rate of compensation, subject to AAA involvement in setting an appropriate rate in the event of disagreement); and the AAA Labor Arbitration Rules,[7] Arbitrator Compensation provision, at 20 (arbitrator compensation shall be in accordance with the fee structure disclosed in the arbitrator's profile).

Apparently to safeguard against misuse of the simplified, expedited, and thereby inexpensive procedure for consumer disputes that they make available, the Rules explicitly provide that the AAA will administer a consumer dispute only if "the AAA reviews the parties' arbitration agreement and if the AAA determines the agreement substantially and materially complies with the due process standards of these Rules and the *Consumer Due Process Protocol.*" R-1(d) at 10 (alteration in original). If, upon review, a business's agreement does not meet those standards, "either party may choose to submit its dispute to the appropriate court for resolution." *Id.*

It is unclear which of the Rules the AAA views as creating material due process standards. But Emeritus's agreement modifies the Rules in only two respects that we

---

[6] https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004362& revision=latestreleased (rules amended and effective November 1, 2009; fee schedule amended and effective Jan.1, 2016) (last visited Jan. 14, 2016).

[7] https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTAGE2012805& revision=latestreleased (rules amended and effective July 1, 2013; fee schedule amended and effective March 15, 2015) (last visited Jan. 14, 2016).

believe the AAA might view as having material implications. First, under the Rules, the business is to bear all of the costs of arbitration (filing fee, hearing fee, and arbitrator compensation) unless the consumer initiates the arbitration, in which case the consumer is responsible for only a $200 filing fee. R-4 and R-5(c) at 13-14 (both incorporating the "Costs of Arbitration" section beginning on page 33 of the Rules). Emeritus's agreement, by contrast, provides that "[t]he arbitrator's fee shall be shared equally by the Parties." CP at 46.[8]

Second, under the Rules, "[t]he arbitrator may grant any remedy, relief, or outcome that the parties could have received in court, including awards of attorney's fees and costs, in accordance with the law(s) that applies to the case." R-44(a) at 28. In the case of the estate's vulnerable adult claim, that could include recovery of its attorney fees and costs. RCW 74.34.200(3). Emeritus's agreement, by contrast, provides, "Each party shall be responsible for its own legal fees." CP at 46.

It is also unclear which provisions of the *Consumer Due Process Protocol* the AAA would regard as creating material standards in determining whether it will administer a consumer arbitration. Among those that we believe might be of concern in this case are the requirement of Principle 2 of the protocol that

---

[8] The estate has abandoned any argument on appeal that the arbitrator fee-sharing term is substantively unconscionable.

14

> [p]roviders of goods or services should undertake reasonable
> measures to provide Consumers with full and accurate information
> regarding Consumer ADR Programs. At the time the Consumer contracts
> for goods or services, such measures should include . . . reasonable means
> by which Consumers may obtain additional information regarding the ADR
> Program.

CP at 329. A related requirement of Principle 11 of the protocol provides:

Consumers should be given:

a.    clear and adequate notice of the arbitration provision and its
      consequences, including a statement of its mandatory or
      optional character; [and]

b.    reasonable access to information regarding the arbitration
      process, including basic distinctions between arbitration and
      court proceedings, related costs, and advice as to where they
      may obtain more complete information regarding arbitration
      procedures and arbitrator rosters.

CP at 331.

Finally, the AAA has a longstanding policy, adopted in 2003 and grounded in due process concerns, that it will not administer healthcare arbitrations between individual patients and healthcare service providers that relate to medical services, such as negligence and medical malpractice disputes, unless all parties agree to submit the matter to arbitration *after* the dispute arises. *See* AAA *Healthcare Policy Statement.*[9] The policy is reflected in the AAA's *Healthcare Due Process Protocol* (Final Report July 27,

---

[9] https://www.adr.org/cs/idcplg?IdcService=GET_FILE&dDocName= ADR STAGE2024674&RevisionSelectionMethod=LatestReleased (last visited Jan. 15, 2016).

15

1998),[10] which was developed in conjunction with the American Bar Association, the American Medical Association, and the Commission on Health Care Dispute Resolution. It contains those entities' unanimous recommendation that "[i]n disputes involving patients, binding forms of dispute resolution should be used only where the parties agree to do so after a dispute arises." *Protocol* at 1.

While we lack the particular criteria applied by the AAA in conducting its due process review, the procedure that it follows is clearly set forth in the Rules. R-1(d) provides:

> The AAA will accept cases after the AAA reviews the parties' arbitration agreement and if the AAA determines the agreement substantially and materially complies with the due process standards of these Rules and the *Consumer Due Process Protocol.*

R-1(d) at 10 (alteration in original).

R-12 provides a process for advance review of arbitration provisions in consumer agreements. If a business's arbitration provision is approved through the advance review process, the business will be included in a publicly accessible Consumer Clause Registry as a business whose consumer disputes the AAA will administer. If a business has not

_____

[10] https://www.adr.org/cs/idcplg?IdcService=GET_FILE&dDocName=ADRSTAGE2025859&RevisionSelectionMethod=LatestReleased (final report July 27, 1998) (last visited Jan. 15, 2016).

16

obtained advance review and a consumer arbitration is then filed with the AAA, the

Rules provide that

> the AAA will conduct an expedited review at that time. Along with any other filing fees that are owed for that case, the business also will be responsible for paying the nonrefundable review and Registry fee (including any fee for expedited review at the time of filing) for this initial review, which is detailed in the Costs of Arbitration section found at the end of these Rules. The AAA will decline to administer consumer arbitrations arising out of that arbitration agreement if the business declines to pay the review and Registry fee.

R-12 at 16.

## II. *Applicable Law and Standard of Review*

Under the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16,[11] arbitration

agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at

law or in equity for the revocation of any contract." 9 U.S.C. § 2. Washington's

arbitration law contains a nearly identical provision. *See also* RCW 7.04A.060(1) ("An

agreement contained in a record to submit to arbitration any existing or subsequent

controversy arising between the parties to the agreement is valid, enforceable, and

irrevocable except upon a ground that exists at law or in equity for the revocation of

contract."). "[B]oth state and federal law strongly favor arbitration and require all

---

[11] The parties' arbitration agreement provides that it "shall be governed by and interpreted under the [FAA]." CP at 46. It provides that "*the dispute* will be governed by the laws of the state in which [Emeritus at Richland Gardens] is located." *Id.* (emphasis added).

17

presumptions to be made in favor of arbitration." *Gandee v. LDL Freedom Enters., Inc.*, 176 Wn.2d 598, 603, 293 P.3d 1197 (2013) (citing *Zuver v. Airtouch Commc'ns, Inc.*, 153 Wn.2d 293, 301, 103 P.3d 753 (2004)).

"Although federal and state courts presume arbitrability, 'generally applicable contract defenses, such as fraud, duress, or unconscionability may be applied to invalidate arbitration agreements without contravening [9 U.S.C.] § 2.'" *Adler v. Fred Lind Manor*, 153 Wn.2d 331, 342, 103 P.3d 773 (2004) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S. Ct. 1652, 134 L. Ed. 2d 902 (1996)). In Washington, either substantive *or* procedural unconscionability is sufficient to invalidate a contract. *Gandee*, 176 Wn.2d at 603 (citing *Adler*, 153 Wn.2d at 347).

"'Substantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh.'" *Zuver*, 153 Wn.2d at 303 (quoting *Schroeder v. Fageol Motors, Inc.*, 86 Wn.2d 256, 260, 544 P.2d 20 (1975)); *Torgerson v. One Lincoln Tower, LLC*, 166 Wn.2d 510, 519, 210 P.3d 318 (2009). "Procedural unconscionability is 'the lack of a meaningful choice, considering all the circumstances surrounding the transaction including [t]he manner in which the contract was entered, whether the party had a reasonable opportunity to understand the terms of the contract, and whether the important terms [were] hidden in a maze of fine print.'" *Adler*, 153 Wn.2d at 345 (alterations in original) (internal quotation marks omitted) (quoting *Nelson v. McGoldrick*, 127 Wn.2d 124, 131, 896 P.2d 1258 (1995)).

"Severance is the usual remedy for substantively unconscionable terms, but where such terms 'pervade' an arbitration agreement, [this court] 'refuse[s] to sever those provisions and declare[s] the entire agreement void.'" *Gandee*, 176 Wn.2d at 603 (quoting *Adler*, 153 Wn.2d at 358). Stated differently, when severance will "significantly alter both the tone of the arbitration clause and the nature of the arbitration contemplated by the clause," the appropriate remedy is to invalidate the entire agreement. *Id.* at 607.

When a motion to compel arbitration is not resolved by trial and fact finding by the court, the appropriate standard of review is de novo. *Neuson v. Macy's Dep't Stores, Inc.*, 160 Wn. App. 786, 792-93, 249 P.3d 1054 (2011). The party opposing arbitration bears the burden of showing that the agreement is not enforceable. *Gandee*, 176 Wn.2d at 602-03.[12]

---

[12] The estate asks us to construe the trial court's ruling as based in part on implicit fact-finding. It argues that in resisting its motion for an evidentiary hearing, Emeritus conceded Scott's version of the circumstances under which the arbitration agreement was signed or, in any event, invited the court to make factual findings on the basis of the parties' declarations. It argues the court's ruling reflects an implicit finding of procedural unconscionability that we should review for substantial evidence in the written submissions.

We reject the estate's characterization of Emeritus's position in the trial court. Emeritus argued that because Scott could not justifiably rely on Ms. Ross's alleged representation as a matter of law, no evidentiary hearing was necessary. There is no indication that the trial court engaged in fact finding in denying the motion to compel arbitration nor would it have been proper for it to resolve disputed material facts on the basis of declarations. In any event, since we do not base our decision on the estate's argument of fraud in the execution, the dispute proves to be moot.

III. *The Trial Court Properly Refused to Compel Arbitration*

A. Futility

In the trial court and on appeal, the estate has argued that in applying the Rules, the AAA or the arbitrator will necessarily decline to administer arbitration of its dispute with Emeritus and will permit it to pursue its claims in court. It contends that for us to reverse the trial court and compel arbitration will be futile. Br. of Resp't at 43. For its part, Emeritus concedes that the AAA will be "prevent[ed]" from administering the parties' arbitration by the 2003 *Healthcare Policy Statement*. Reply Br. at 15. At oral argument, Emeritus's counsel reported that it has not yet submitted a demand for arbitration to the AAA.[13]

According to Emeritus, the AAA's foreseeable refusal to administer an arbitration under the parties' agreement is not an obstacle to arbitration, because "the Agreement requires that the arbitration be administered 'in accordance with' AAA's rules—not that it be administered by AAA." *Id.* According to Emeritus, "this Court and numerous other courts have held that the inability of AAA to administer health care disputes will not invalidate an arbitration agreement nor will it preclude the parties' chosen arbitrator from using AAA's rules." *Id.*

---

[13] Wash. Court of Appeals oral argument, *Woodward v. Emeritus Corp.*, No. 32880-5-III (Sept. 10, 2015) at 21 min., 7 sec. through 21 min., 20 sec. (on file with the court).

20

There are two facets to Emeritus's argument that the AAA need not administer the arbitration: an argument that AAA administration is not required by the parties' agreement, and an argument that if an agreed administration fails, the courts have statutory authority to substitute another process.

We address the contract-based argument first. Emeritus relies on *Gandee*, in which a debt adjustment business, LDL, sought to enforce an arbitration agreement that provided, "'All disputes or claims between the parties related to this Agreement shall be submitted to binding arbitration in accordance with the rules of [the] American Arbitration Association within 30 days from the dispute date or claim.'" 176 Wn.2d at 602 (alteration in original). In response to the consumer's argument that the arbitration agreement was substantively unconscionable based on the cost of arbitrating through the AAA, LDL argued that its clause "does not require arbitration with the AAA but only that the rules of the AAA be followed." *Id.* at 605. While the court responded, "This assertion appears correct," it then quickly rejected LDL's attempted rebuttal of the consumer's evidence, since LDL failed to present any evidence of the cost of an alternative forum. *Id.*

The statement, "This assertion appears correct," is dicta. It addressed an assertion that was not disputed in the Supreme Court and that bore on an argument that was easily rejected on other grounds. The court did not engage in any examination of whichever

21

AAA rules applied. There is also no suggestion that the case involved the Rules at issue in this case.

Provisions of the Rules directly contradict Emeritus's argument that the parties' dispute need not be administered by the AAA. R-1(b) provides that "[w]hen parties agree to arbitrate under these Rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these Rules, *they thereby authorize the AAA to administer the arbitration.*" (Emphasis added.) While the Rules provide that the consumer and the business may agree to change the Rules, "they must agree in writing." R-1(c) at 10. Nothing in Emeritus's agreement changes the AAA's authorized administration of the arbitration under R-1(c) by withholding administration authority from the AAA.

The parties' agreement does not provide for administration by someone other than the AAA. When asked at oral argument of the appeal who would be the administrator if not the AAA, Emeritus's counsel suggested that the arbitrator could serve as the administrator.[14] But the parties' agreement says nothing that amounts to "the arbitrator shall also serve as administrator." Under the Rules, the "administrator" and the "arbitrator" are distinct and have different responsibilities. The Glossary of Terms appearing at the end of the Rules define them separately, providing, in part, that "[t]he

---

[14] Wash. Court of Appeals oral argument, *Woodward v. Emeritus Corp.*, No. 32880-5-III (Sept. 10, 2015) at 28 min., 21 sec. through 29 min., 00 sec (on file with the court).

Administrator's role is to manage the administrative aspects of the arbitration," while arbitrators "are neutral and independent decision makers who are not employees of the administrator." Rules at 39-40. Emeritus is the author of the agreement, which, if ambiguous, must be construed against it. *Mendez v. Palm Harbor Homes, Inc.*, 111 Wn. App. 446, 459, 45 P.3d 594 (2002). To contend that the arbitrator will serve as both arbitrator and administrator is to read something into the agreement for which there is no textual support whatsoever. The AAA is the only administrator contemplated by the parties' agreement and its incorporated Rules.

And whoever serves as administrator, the parties' arbitration will not be "administered in accordance with the procedures in effect for consumer arbitration adopted by the [AAA]," CP at 45, unless that administrator reviews whether Emeritus's arbitration agreement substantially and materially complies with the due process standards of the Rules and the *Consumer Due Process Protocol*—failing which, administration under the Rules should be declined and the parties should be permitted to submit the dispute to court. R-1(d) at 10. The parties' agreement does not waive due process review. Again, to change the Rules' requirement for due process review, the "[parties] must agree in writing." R-1(c) at 10.

For the second facet of its argument—that if the AAA declines to administer, the court may substitute another administrator—Emeritus relies on *Nail*, 155 Wn. App. 227. The parties in that case had agreed that their arbitrators "shall apply the applicable rules

of procedure of the AAA." *Id.* at 230. It is evident that *Nail* did not involve the AAA's consumer rules.[15] This court held that under the agreement at issue in that case, "the method of choosing arbitrators was specified," but "the agreement did not require exclusive AAA administration." *Id.* at 230. Because the method of selecting arbitrators failed, the court applied RCW 7.04A.110(1), which authorizes a court to appoint a substitute arbitrator when the appointed arbitrator fails or is unable to act.[16]

This case is distinguishable because the Rules incorporated in the agreement between Emeritus and the estate (and thereby a part of their agreement) dictate a different result. In promulgating the Rules, which create a simplified, expedient, and inexpensive process for the resolution of consumer disputes, the AAA included a process by which it could protect consumers from being subjected to unsuitable rules where an agreement substantially and materially violated its due process standards. And it explicitly provided what would happen if it found a due process-offending agreement to arbitrate:

---

[15] The decision states that the parties' agreement "did not require exclusive AAA administration," whereas the Rules do; the decision also states, "Notably, AAA did not legislate its policy statement into a specified rule of procedure, whereas the AAA did legislate a due process review process into the Rules. *Nail*, 155 Wn. App. at 234; *compare* R-1(b) at 10 (authorizing the AAA to administer the arbitration) *and* R-1(d) at 10 (providing for AAA's due process review).

[16] Also at issue in *Nail* was whether the AAA's 2003 *Healthcare Policy Statement* was a "rule of procedure" of the AAA, such that the arbitrators would be bound to apply it and reject any arbitration agreement that was not a postdispute arbitration agreement. This court held that the policy statement was not a "rule of procedure." *Id.* at 234.

> Should the AAA decline to administer an arbitration, *either party may choose to submit its dispute to the appropriate court for resolution.*

R-1(d) at 10 (emphasis added). This is not an instance in which the arbitration method failed, leaving the parties without any agreed substitute process for resolving their dispute. This is an instance in which the Rules expressly provide that if the AAA concludes that arbitration will not afford due process, then either party is free to litigate. Where freedom to litigate was the agreed alternative, the trial court properly denied the motion to compel arbitration.

### B. Substantive unconscionability

Alternatively, we hold that the agreement is substantively unconscionable as applied to the estate's negligence and vulnerable adult claims. When arbitration is resisted on the basis of unconscionability, "'[t]he existence of an unconscionable bargain is a question of law for the courts.'" *Mendez*, 111 Wn. App. at 458 (quoting *Nelson*, 127 Wn.2d at 131). It is an issue that courts approach both in law and equity, exercising the power to prevent enforcement of a legal right when to do so would be inequitable under the circumstances. *Id.* at 460 (citing *Thisius v. Sealander*, 26 Wn.2d 810, 818, 175 P.2d 619 (1946)).

First, the arbitration agreement provides that, "[e]ach party shall be responsible for its own legal fees." CP at 46. Washington cases hold that such a provision is substantively unconscionable when it effectively undermines a plaintiff's statutory

25

entitlement to an award of attorney fees. *Adler*, 153 Wn.2d at 355. It would effectively undercut the estate's right to attorney fees if it prevails on its claim asserted under RCW 74.34.200(3). Emeritus does not explicitly concede that the attorney fees term is unconscionable, but it suggests that it should be severed.

Second, while the parties were free to contract for arbitration under the Rules, the Rules are inherently unsuited to the nature and complexity of the estate's claims. Emeritus cites *Gilmer v. Interstate/Johnson Lane Corp.*, in which the Supreme Court observed that "by agreeing to arbitrate, a party 'trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'" 500 U.S. 20, 31, 111 S. Ct. 1647, 114 L. Ed. 2d 26 (1991) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985)). But while some arbitral limitations on the procedures and opportunities that would be available in "the courtroom" are to be expected and do not result in an agreement that is overly harsh, others can—and the Rules, as applied to healthcare personal injury claims, do.

The Rules were designed for simple business disputes: they presume that the arbitration will be completed in one day, that the only discovery to be ordered will be specific documents and information directed by the arbitrator along with witness identification, and that it will be sufficient for the parties to exchange exhibits five days

26

before the hearing. They cap the arbitrator's compensation at $1,500 per day—for an eight hour hearing day, that is less than $200 per hour.

The estate supported its argument that these procedures were inappropriate with two declarations, the first being that of Lesley Ann Clement, a California lawyer who prepared the declaration in support of an award of fees and costs against Emeritus in an unrelated action. While much of her declaration is irrelevant, it does establish her considerable experience with elder abuse litigation and describes relevant discovery needs when pursuing claims such as the estate's:

> [I]t is crucial to uncover the "why" of the neglect—that is, the underlying factors and policies that led to the client's injury and/or death. This requires multiple rounds of written discovery and depositions (necessitating motions to compel) to investigate the facility's staffing, training, supervision, and budgeting, among other things. . . . [T]here is often extremely high turnover among caregiving staff at long-term care facilities. Learning details about the facility's operations during the client's stay is not a simple matter of serving deposition notices; rather, former staff must be located, interviewed and/or subpoenaed.

CP at 339. It also asserts that in Ms. Clement's litigation against Emeritus, "Plaintiffs were forced to file at least fourteen successful motions to compel, and were awarded more than $16,000 in sanctions." CP at 341. While this does not suggest that Emeritus would resist reasonable discovery in this Washington dispute nor reflect in any way on its Washington lawyers, it is evidence that a California court recognized that the opportunity for adequate discovery is important in an elder abuse action.

27

The estate also submitted the declaration of a Kennewick lawyer, Francois Forgette, who had "regularly served as a mediator or arbitrator in civil disputes since approximately 1995." CP at 381. He testified that his stated rate as an arbitrator is $325 to $350 per hour, and expressed the opinion, based on his experience as an arbitrator in the Tri-Cities and the Central Washington region, that

> the proposal of a flat arbitrator's fee of $1,500 per day . . . is likely unreasonable and is less likely to result in the selection of a mutually agreeable and qualified arbitrator. This would particularly hold true where the case at issue is neither routine, nor simple. The flat fee arrangement described appears only suitable for small collection or other such civil disputes. An experienced and qualified arbitrator is unlikely to consent to such a flat fee arrangement if the matter is likely complex, will require extended prep or a long hearing, or will take careful consideration to complete and draft the decision.

CP at 381.

Emeritus's response is that the arbitrator can reject the presumptions about the amount of discovery and the length of the hearing and even "jettison [the] rules altogether." Br. of Appellant at 15 (citing Rule R-1(e) at 11, under which, if the AAA makes the decision to apply the consumer rules, either party may object, and "the arbitrator shall have the authority to make the final decision on which AAA rules will apply"). But the fact remains that the Rules to which the parties agreed, and the presumptions and standards that the Rules provide—that the process remain "fast and economical," R-22 at 20; that more than minimal discovery be ordered only if "needed to provide a fundamentally fair process," R-22(c) at 20; and that a hearing extend beyond a

28

day only for "good cause," R-32(d) at 24—are unsuitable for the types of claims asserted by the estate, as the AAA itself recognizes. And it is not enough to argue, as Emeritus does, that it will be equally disadvantaged by the limitations of the Rules. It is foreseeable that most of the relevant evidence is in the possession of Emeritus and its present and past employees, not the estate. And the estate bears the burden of proof.

Emeritus also argues that the $1,500 daily fee for the arbitrator only "applies to AAA-administered arbitrations, for arbitrators appointed from AAA's National Roster." Reply Br. at 15. Nothing in the parties' agreement or the Rules supports that assertion. The Rules contemplate arbitrators might or might not be appointed from the AAA's national roster—they allow parties to identify their own arbitrator or agree on a process for identifying an arbitrator that does not rely on the roster. R-16(a) at 18. Whether the arbitrators are appointed from the AAA's national roster or not, the Rules provide that "[a]rbitrators serving under these Rules shall be compensated at a rate established by the AAA" and "be paid in accordance with the Costs of Arbitration section found at the end of these Rules." R-5(a), (c) at 14. The Costs of Arbitration section provides at its paragraph (ii) at 34, "Arbitrators serving on a case with an in-person or telephonic hearing will receive compensation at a rate of **$1500 per day.**" No distinction is made in any of these provisions between national roster arbitrators or privately-selected arbitrators. Nowhere do the rules provide that an arbitrator can be paid at his or her stated rate.

Considering all, it is understandable why the AAA reserved the authority under the Rules to decline administration and leave the parties to litigate. Inappropriate terms pervade the Rules as applied to the estate's claims, in addition to the substantively unconscionable attorney fee's provision. For this additional reason, arbitration should not be compelled.

Affirmed.

_____
Siddoway, C.J.

WE CONCUR:


_____
Brown, J.


_____
Lawrence-Berrey, J.