[No. 21809-7-II.   Division Two.   June 26, 1998.]

DEBORAH GOVIER, *Appellant*, v. NORTH SOUND BANK, *Respondent*.

494

*Barbara J. Stratton* of *Blado Stratton, P.S.*, for appellant.

*Lisa J. Oman* of *Karr Tuttle Campbell*, for respondent.

SEINFELD, J. — Deborah Govier sued her employer, North Sound Bank, after the Bank presented her with a new employment agreement that substantially changed the terms of her previous employment. The trial court dismissed the action on summary judgment. We affirm, holding that an employer may modify the terms of employment without the employee's assent where the employer established those terms by a "unilateral" contract. We further hold that an employee's refusal to agree to the employer's

reasonable terms of employment constitutes a constructive resignation.

## FACTS

In March 1991, North Sound Bank hired Govier as a loan originator. She accepted the position without negotiating the terms of her employment.

On her first day of work, Govier completed an employment application and signed a declaration stating that the information she provided was "correct and complete" and that any misstatement or omission would be considered "cause for dismissal." Govier wrote that she left a former employer, Continental Mortgage, for a "better opportunity." She did not state her reason for leaving her most recent employer, Washington Mutual Savings Bank.

The Bank gave Govier a copy of its personnel handbook on her first day of work. She signed an acknowledgment of its receipt and read it. The Bank did not tell Govier that her employment was for any particular length of time.

The personnel handbook described the Bank's expectations of employees and the benefits it would provide. It specifically contained the following provisions:

PROBATIONARY PERIOD: A probationary period lasting the first ninety days of your new job applies to all new employees . . . . If you reach the end of this probationary period successfully, you will have your first formal performance appraisal interview with your supervisor prior to the end of the first ninety days, and you will be considered a *permanent employee, assuming continued satisfactory performance.*

. . . .

DISMISSAL:

An employee is dismissed only after a thorough review of the performance record by the supervisor and the President or Vice President. If you are making a real effort to perform well and have passed your probationary period, you would not be dismissed for poor performance without first being counselled

[sic] by your supervisor regarding your deficiencies and being given an opportunity to improve your performance. If your job were to be abolished, every effort would be made to find another suitable position within the Bank for you before dismissal is considered. The Bank will exercise its right to dismiss employees for cause, with or without advance notice and with or without payment in lieu of notice, depending on a thorough evaluation of the performance record. Of course, no notice or payment in lieu of notice will be due during the probationary period. Additionally, no notice, no payment in lieu of notice and no payment for unused vacation time will be due in any instance involving dishonesty, immoral conduct, serious lack of attention to duty or conduct damaging to the public's faith in the good name of the Bank.

(Emphasis added.)

These provisions did not change throughout Govier's employment. The Bank's officers regarded the provisions concerning dismissal to be obligatory in that they could not terminate an employee who had worked beyond the 90-day probationary period except for cause.

During Govier's employment, the Bank unilaterally modified the handbook at least eight times. It made each modification effective immediately by distributing a memo to all employees informing them of the changes.

In 1993, the Bank's officers decided to better define the position of loan originator and to put the duties and benefits in writing. Relying upon a survey of other financial institutions regarding industry standards, the Bank drafted individual employment agreements for its loan originators. On December 7, the Bank first presented the agreements to the loan originators, including Govier, and asked for input. Then, on December 14, after making some modifications, the Bank presented the agreements in final form and told the loan representatives that they must sign their contracts by December 17 or be terminated.

The new agreement was for a one-year period, provided for renegotiation at the end of the year, and required cause for termination, but allowed either party to terminate upon

20 days' written notice. It based compensation entirely upon commission and eliminated sick leave and holiday and vacation pay.

Matters not addressed in the agreements were to be resolved according to the employee handbook. But the Bank expressly reserved the right to change any of its policies, including those covered in the handbook, at any time. The Bank amended the section of the handbook listing the benefits and services provided to full-time employees by adding the following:

NOTE: MORTGAGE LOAN ORIGINATORS HAVE ONLY THOSE BENEFITS DESCRIBED IN THEIR LOAN ORIGI-NATOR AGREEMENT CONTRACTS.

Govier, who was unhappy with the new terms, was the only loan originator who refused to sign the new agreement. Consequently, on December 17, the Bank sent her a letter of termination.

In October 1994, Govier filed suit for breach of the employment contract embodied in the Bank's personnel handbook. During discovery, the Bank learned that Govier left or was terminated from her employment at Continental Mortgage and Washington Mutual because of poor performance.

The Bank moved for summary judgment contending that (1) the employee handbook did not constitute an employment contract; (2) if it did, the Bank effectively modified Govier's contract by giving her reasonable notice of the changes; and (3) Govier constructively quit her employment; or in the alternative, (4) Govier's misrepresentation and omission on her employment application constituted "just cause" for dismissal or grounds to rescind the contract.

The trial court dismissed Govier's claim on summary judgment, finding that the Bank's employee handbook created a "just cause" employment contract, but that the Bank's giving of actual notice of modifications was reasonable as a matter of law. Implicitly, the court concluded that

the Bank did not need Govier's assent to effectuate changes to the terms of her employment and that Govier's refusal to sign the agreement and her subsequent termination were equivalent to a constructive resignation rather than a dismissal. The court did not decide whether Govier's misrepresentation and omission on her employment application constituted grounds for dismissal or rescission of the contract.

On appeal, Govier contends that the Bank could not substantially modify her employment terms without obtaining her assent or providing separate consideration. In the alternative, she claims either that (a) the Bank's proposed changes never became effective because the Bank failed to give reasonable "advance" notice, or, (b) the Bank breached the new agreement by terminating her without cause and without giving 20 days' written notice.

## DISCUSSION

A. Unilateral Modification

■ An employer may unilaterally amend or revoke policies and procedures established in an employee handbook. *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, 434, 815 P.2d 1362 (1981) (citing *Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 613, 292 N.W.2d 880 (1980)). It may do so even when the employer does not expressly reserve the right to make such changes from the outset. *Id.* at 434 (citing *Bankey v. Storer Broad. Co.*, 432 Mich. 438, 443 N.W.2d 112, 120 (1989)). But an employer's unilateral changes in policy become effective only when the employee receives reasonable notice of the change. *Id.* at 434; *Bankey*, 443 N.W.2d at 120; *Fleming v. Borden Inc.*, 316 S.C. 452, 450 S.E.2d 589, 595-96 (1994).

Govier concedes that it is possible to read *Gaglidari* "broadly" to hold that "an employer may unilaterally amend or revoke policies and procedures established in an employee handbook in any and all cases, effective when the

employee has received reasonable notice of the change." But she argues against this broad reading, urging us to apply traditional contract formation analysis in examining the contract and to apply bilateral contract principles.

A traditional bilateral contract is formed by the exchange of reciprocal promises. The promise of each party is consideration supporting the promise of the other. *Ebling v. Gove's Cove, Inc.*, 34 Wn. App. 495, 499, 663 P.2d 132 (1983). Here, Govier accepted the Bank's offer of employment without knowledge of the promises contained in the employee handbook, and there is no evidence that she negotiated the terms of her employment. Nor did the Bank tell her that the handbook constituted an employment contract and, unlike in *Gaglidari*, she did not expressly agree to be bound by its terms. *See Gaglidari*, 117 Wn.2d at 433 (plaintiff signed an acknowledgment form "agreeing to abide by [the manual's] provisions"). Further, the Bank unilaterally modified the employee handbook at least eight times during Govier's employment without consulting her or requesting her assent. Thus, bilateral contract analysis is not applicable.

Rather, because of the circumstances here, the provisions in the employee handbook had the force of a unilateral contract, one in which the promisor does not receive a promise in return as consideration. *Bankey*, 443 N.W.2d at 115. The Bank's promises constituted the terms of the employment agreement; Govier's action or forbearance in reliance upon the Bank's promises constituted sufficient consideration to make the promises legally binding. *Id*. at 116.

The rationale for allowing an employee to enforce a written personnel policy is that the employer has derived a benefit in the nature of workplace harmony and productivity from its policy's existence. It does not turn on the mere fact that the employer made certain promises that the employee accepted. *Id*. at 119 (citing *Toussaint*, 292 N.W.2d at 892); *see also Gaglidari*, 117 Wn.2d at 433; *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 230, 685 P.2d 1081

(1984) (employer obligations may arise independent of traditional contract analysis when employer promises specific treatment in specific situations and employee relies thereon). Thus, an employer may revoke or modify these policies without mutual assent, as the *Bankey* court acknowledged:

> "While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices *or that the employer may change them unilaterally.* It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official *at any given time*, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation 'instinct with an obligation.' "

*Bankey*, 443 N.W.2d at 119 (emphasis added) (quoting *Toussaint*, 292 N.W.2d at 892). Under the *Bankey/Toussaint* analysis, the benefit to the employer of promoting a collectively productive environment, rather than the traditional contract-forming mechanisms of mutual assent or individual detrimental reliance, gives rise to the employer's enforceable obligation.

> [W]here "contractual rights" have arisen outside the operation of normal contract principles, the application of strict rules of contractual modification may not be appropriate.

*Id.* at 116; *see also Adams v. Square D. Co.*, 775 F. Supp. 869, 872 (D.S.C. 1991).

There are persuasive policy reasons supporting this

conclusion. As the *Bankey* court noted, "[i]n the modern economic climate, the operating policies of a business enterprise must be adaptable and responsive to change." 443 N.W.2d at 120; *see also Ferrera v. Nielsen,* 799 P.2d 458, 460 (Colo. Ct. App. 1990). An employer that could not change its policies without renegotiating with each employee could find itself obligated in a variety of different ways to any number of different employees. *Bankey,* 443 N.W.2d at 120. The resulting confusion and uncertainty would not be conducive to harmonious labor-management relations. *Hogue v. Cecil Walker Mach. Co.,* 189 W. Va. 348, 431 S.E.2d 687, 691 (1993); *Adams,* 775 F. Supp. at 873. The law should not tie employers to anachronistic policies in perpetuity merely because they failed to expressly reserve at the outset the right to make policy changes. *Bankey,* 443 N.W. 2d at 120.

The Bank here apparently was responding to a perceived business need to conform to industry standards for employing loan originators. Before drafting the new agreements, it surveyed other financial institutions and found that a majority of them had individual employment agreements with loan originators and based compensation entirely upon commission. Nor is there any evidence that the Bank singled out Govier for harsh treatment or acted in bad faith.

■ Govier's reliance on *Swanson* is misplaced. *Swanson v. Liquid Air Corp.,* 118 Wn.2d 512, 520, 826 P.2d 664 (1992). The *Swanson* court, relying on *Thompson,* recognized that an employer's policy in an employee handbook can become legally enforceable *either* because the employer and employee contractually obligated themselves, *or* because policies expressed in employee handbooks "create an atmosphere where employees justifiably rely on those expressed policies and justifiably expect that the employer will abide by those same policies." *Id.* Although the Bank's policies regarding benefits and job security were legally enforceable, its obligations existed only while its policies were in effect. When the Bank changed the duration of Govier's

employment from an indefinite period to one year, and eliminated vacation leave and sick and holiday pay, the former contract terms were no longer enforceable. *Bankey*, 443 N.W.2d at 119; *Adams*, 775 F. Supp. at 872 (liberal rules of contract modification apply when liberal rules of contract formation used).

B. Reasonable Notice

■ Govier contends, in the alternative, that the Bank was required to notify her of the proposed contract changes a reasonable length of time before their effective date. She asserts that the reasonable notice requirement is necessary "to give the employee an opportunity to make a reasoned decision about whether to stay or leave." The Bank asserts that the purpose of "reasonable notice" is to *inform* employees of policy changes and, thus, actual notice is reasonable notice as a matter of law. We find no authority for Govier's position.

An employer's unilateral policy change becomes effective upon "reasonable notice" uniformly given to affected employees. *Gaglidari*, 117 Wn.2d at 434 (citing *Bankey*, 443 N.W.2d at 120). Actual notice is reasonable notice. *See, e.g.*, *Gaglidari*, 117 Wn.2d at 435; *Nelson v. Southland Corp.*, 78 Wn. App. 25, 30, 894 P.2d 1385 (1995); *Adams*, 775 F. Supp. at 873; *Hogue*, 431 S.E.2d at 691.

The *Gaglidari* court found *Bankey*'s reasonable notice rule persuasive because

> it is unfair to place the burden of *discovering* policy changes on the employee. While the employee is bound by unilateral acts of the employer, it is incumbent upon the employer to *inform* employees of its actions.

*Gaglidari*, 117 Wn.2d at 435 (emphasis added). The plaintiff in *Gaglidari*, a bartender, had signed a form saying she read and understood provisions about fighting on company premises. Thus, those provisions were binding upon her. But she was not bound by unilateral revisions of company policies contained in an earlier version of an em-

ployee handbook that she never received. *Id.*

Govier's reliance on Justice Dolliver's concurrence in *Swanson* is also misplaced. In *Swanson*, the employer mailed a disclaimer provision to the employee in a packet containing some 200 pages; the employee did not acknowledge its receipt. 118 Wn.2d at 515, 529-30. The *Swanson* court held that "in order to be effective, a disclaimer . . . must be communicated to the employee." 118 Wn.2d at 529.

Justice Dolliver disagreed with the proposition advanced by the majority that "an employer must ensure that each employee is *personally aware* of a disclaimer in an employee handbook in order for it to be effective." *Swanson*, 118 Wn.2d at 541 (emphasis added) (Dolliver, J., concurring). In a sentence quoted by Govier, he stated: "Reasonable notice should be established when an employer uniformly disseminates specific modifications to affected employees a reasonable length of time prior to their taking effect." *Id.* at 544 (Dolliver, J., concurring). But he was arguing for a holding that "because the disclaimer was specific, conspicuous, included in the revised handbook, and disseminated to the plaintiff, it was effective as a matter of law." *Id.* at 545.

Here, unlike in *Swanson*, there is no dispute that the Bank effectively communicated the new agreement to Govier. *Id.* at 531. Thus, she received reasonable notice.

## C. Constructive Resignation

Finally, Govier contends that the Bank breached the terms of its new contract by terminating her in violation of its 20-day written notice and for cause provisions. But Govier refused to accept the new terms. Thus, she cannot turn to them for relief.

■ We note that these facts are similar to those described in cases from other jurisdictions dealing with the concept of constructive resignation, a concept distinct from that of

constructive discharge as recognized in this State. *See, e.g., Bulaich v. AT&T Info. Sys.*, 113 Wn.2d 254, 259, 778 P.2d 1031 (1989).[1] The doctrine of constructive resignation applies where an employee has a choice of either complying with a reasonable requirement or terminating employment. If the employee refuses to comply, the employer may consider the refusal an election to quit. *Steinberg v. Unemployment Ins. Appeals Bd.*, 87 Cal. App. 3d 582, 151 Cal. Rptr. 133, 135 (1978); *see also Hildebrand v. Unemployment Ins. Appeals Bd.*, 19 Cal.3d 765, 140 Cal. Rptr. 151, 566 P.2d 1297, 1298 (1977). Even though the employee maintains he is not quitting, his acts have constructively acted for him. *Steinberg*, 151 Cal. Rptr. at 135. " '[A]ffirmative steps' are not necessary to effectuate a resignation." *Hammon v. DHL Airways, Inc.*, 980 F. Supp. 919, 924 (S.D. Ohio 1997); *State ex rel. Waldman v. Burke*, 152 Ohio St. 213, 88 N.E.2d 578, 579 (1949).

Here, Govier does not contend that the Bank acted unreasonably. And it is clear that she refused to acknowledge receipt of the new terms of employment. Her conduct, similar to that in *Hildebrand*, *Waldman*, and *Hammon*, was the equivalent of a voluntary job separation or "constructive resignation." Thus, she is not entitled to relief under the contract that she rejected.

D. Breach of the Agreement as Modified

The Bank also argues that Govier's concealment of her employment history on her job application constituted "just cause" for dismissal. It contends that because it would not have hired her but for the misrepresentation, under contract principles it was entitled to rescind the contract. We find it unnecessary to reach these contentions based upon our disposition above.

In summary, although the promises in the Bank's employee handbook were legally enforceable, the Bank ef-

---

[1]Under the doctrine of constructive *discharge*, "an involuntary or coerced resignation is equivalent to a discharge." *Micone v. Steilacoom Civil Serv. Comm'n*, 44 Wn. App. 636, 639, 722 P.2d 1369 (1986).

fectively modified those terms by giving Govier reasonable notice of the changes. Govier constructively resigned when she refused to sign the new agreement and, thus, could not enforce the terms of the new agreement. Consequently, the trial court did not err in dismissing her claim.

We affirm.

BRIDGEWATER, A.C.J., and ARMSTRONG, J., concur.