IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STEVEN BURNETT, individually and on behalf of all others similarly situated, | ) ) ) | No. 78356-4-I |
| Respondent, | ) ) | DIVISION ONE |
| v. | ) ) ) | PUBLISHED OPINION |
| PAGLIACCI PIZZA, INC., a Washington corporation, | ) ) ) | FILED: June 17, 2019 |
| Appellant. | ) ) ) | |

SMITH, J. — When Steven Burnett was hired as a delivery driver by Pagliacci Pizza Inc., he was required to sign an "Employee Relationship Agreement" to begin work. He was also given an employee handbook containing a mandatory arbitration policy and told to read it at home. When Burnett later sued Pagliacci for various wage-related claims, Pagliacci moved to compel arbitration under the policy printed in its handbook. Pagliacci appeals the trial court's denial of that motion.

We hold that because Burnett did not have a reasonable opportunity to review the arbitration policy before he was required to sign the Employee Relationship Agreement, the circumstances surrounding the formation of the parties' agreement to arbitrate were procedurally unconscionable. We hold further that the mandatory arbitration policy is substantively unconscionable because certain prerequisites to arbitration required by the policy unreasonably

favor Pagliacci by limiting employees' access to substantive remedies and discouraging them from pursuing valid claims. Therefore, we affirm.

FACTS

Pagliacci hired Burnett as a delivery driver for Pagliacci's Valley Street location in October 2015. Upon hire, Burnett attended a mandatory orientation, which took between 40 minutes and an hour. At the orientation, Burnett was shown around the store, given Pagliacci T-shirts, and told about Pagliacci's history and values. He also watched some videos about how to succeed as a delivery driver. Additionally, Burnett was given some forms and told to sign them so that he could start working. One of those forms was an Employee Relationship Agreement (ERA), which Burnett signed. Burnett was also given a copy of Pagliacci's "Little Book of Answers" (Little Book) and told to read it at home. Although the ERA directs the employee to "learn and comply with the rules and policies outlined in our Little Book . . . , including those that relate to positive attitude, public safety, company funds, tips and FAIR [Fair and Amicable Internal Resolution] Policy," the ERA does not mention arbitration.

Pagliacci terminated Burnett's employment on January 22, 2017. In October 2017, Burnett filed a putative class action against Pagliacci, alleging among other things that Pagliacci failed to provide delivery drivers with required rest and meal periods, failed to pay all wages due to delivery drivers, wrongfully retained delivery charges, and made unlawful deductions from delivery drivers' wages.

Pagliacci moved to compel arbitration of Burnett's claims under its

2

mandatory arbitration policy, which is printed in the Little Book. That policy

provides:

> The company has a mandatory arbitration policy with which you must comply for the binding resolution of disputes without lawsuits. If you believe you have been a victim of illegal harassment or discrimination or that you have not been paid for all hours worked or at less than the rate of pay required by law or that the termination of your employment was wrongful, you submit the dispute to resolution in accordance with the F.A.I.R. Policy and if those procedures are not successful in resolving the dispute, you then submit the dispute to binding arbitration before a neutral arbitrator pursuant to the Washington Arbitration Act.

The "F.A.I.R. Policy" referred to in the mandatory arbitration policy requires that

before commencing arbitration, the employee first "report the matter and all

details" to his or her supervisor (Supervisor Review). If Supervisor Review does

not resolve the matter to the employee's satisfaction, he or she may initiate

nonbinding conciliation, wherein the "F.A.I.R. Administrator will designate a

responsible person at Pagliacci Pizza (who may be its owner) to meet face-to-

face with you in a non-binding Conciliation." The F.A.I.R. Policy also includes the

following limitations provision:

> You may not commence an arbitration of a claim that is covered by the Pagliacci Pizza Arbitration Policy or commence a lawsuit on a claim that is not covered by the Pagliacci Pizza Arbitration Policy unless you have first submitted the claim to resolution in conformity with the F.A.I.R. Policy and fully complied with the steps and procedures in the F.A.I.R. Policy. If you do not comply with a step, rule or procedure in the F.A.I.R. Policy with respect to a claim, you waive any right to raise the claim in any court or other forum, including arbitration. The limitations set forth in this paragraph shall not be subject to tolling, equitable or otherwise.

Burnett opposed Pagliacci's motion to compel arbitration. He argued that

the mandatory arbitration policy was both procedurally and substantively

3

unconscionable, but the trial court did not reach those arguments. Instead, it concluded that although Burnett agreed under the ERA to "learn and comply with the rules and policies outlined in our Little Book," the Little Book was not incorporated by reference into the ERA. The court therefore denied Pagliacci's motion, finding there was no agreement to arbitrate.[1]

Pagliacci moved for reconsideration, arguing that the Little Book was incorporated by reference into the ERA. Pagliacci also argued that regardless of whether it was incorporated by reference into the ERA, the Little Book created an agreement to arbitrate because Burnett received a copy of it and then continued his employment thereafter. The court denied Pagliacci's motion for reconsideration. Pagliacci appeals.[2]

## ANALYSIS

Pagliacci argues that the trial court erred by denying its motion to compel arbitration and its subsequent motion for reconsideration. We disagree.

Arbitrability is a question of law that we review de novo. McKee v. AT&T Corp., 164 Wn.2d 372, 383, 191 P.3d 845 (2008). "The burden of proof is on the party seeking to avoid arbitration." McKee, 164 Wn.2d at 383. "Regardless of

---

[1] Although the trial court did not reach Pagliacci's unconscionability arguments in its written order, it indicated in its oral ruling that it had concerns regarding the Little Book both in terms of procedural unconscionability and substantive unconscionability.

[2] A superior court's order denying a motion to compel arbitration is not expressly listed as an appealable decision under RAP 2.2, and Pagliacci did not seek discretionary review under RAP 2.3. But in Stein v. Geonerco, Inc., 105 Wn. App. 41, 43-45, 17 P.3d 1266 (2001), we recognized that the right to arbitrate is a "substantial right" under RAP 2.2(a)(3) and held that an order denying a motion to compel arbitration is appealable on an interlocutory basis. Burnett does not argue otherwise.

whether the Federal Arbitration Act[3] . . . or the Washington uniform arbitration act[4] . . . applies, our analysis as to whether . . . claims are subject to arbitration begins in the same manner." Weiss v. Lonnquist, 153 Wn. App. 502, 510, 224 P.3d 787 (2009).[5] Specifically, "[a]s arbitration is a matter of contract, parties cannot be compelled to arbitrate unless they agreed to do so." Weiss, 153 Wn. App. at 510.

In determining whether an agreement to arbitrate exists, we first determine whether the parties have agreed to arbitrate a particular matter by applying ordinary contract principles. Weiss, 153 Wn. App. at 511; see also Tjart v. Smith Barney, Inc., 107 Wn. App. 885, 895-97, 28 P.3d 823 (2001) (considering whether an arbitration agreement existed before analyzing whether the arbitration agreement was enforceable). Where, as here, no material facts are in dispute, contract interpretation is a question of law that we review de novo. Dave Johnson Ins. v. Wright, 167 Wn. App. 758, 769, 275 P.3d 339 (2012). Additionally, if an agreement to arbitrate exists, "[g]eneral contract defenses such as unconscionability may invalidate arbitration agreements." McKee, 164 Wn.2d at 383. Unconscionability is also a question of law reviewed de novo. McKee, 164 Wn.2d at 383.

For the reasons that follow, we conclude that an agreement to arbitrate exists here but that the agreement is unconscionable and unenforceable.

---

[3] 9 U.S.C. §§ 1-16.
[4] Chapter 7.04A RCW.
[5] For this reason, we do not decide whether the Federal Arbitration Act applies, an issue that was raised below but not argued on appeal.

*Existence of Arbitration Agreement*

Pagliacci argues that the trial court erred by concluding that the mandatory arbitration policy was not incorporated into the ERA and consequently there was no agreement to arbitrate. We agree.

"Incorporation by reference allows the parties to 'incorporate contractual terms by reference to a separate . . . agreement to which they are not parties, and including a separate document which is unsigned.'" W. Wash. Corp. of Seventh-Day Adventists v. Ferrellgas, Inc., 102 Wn. App. 488, 494, 7 P.3d 861 (2000) (alteration in original) (quoting 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 30:25, at 233-34 (4th ed. 1999)). "'But incorporation by reference is ineffective to accomplish its intended purpose where the provisions to which reference is made do not have a reasonably clear and ascertainable meaning.'" Seventh-Day Adventists, 102 Wn. App. at 494 (quoting 11 WILLISTON & LORD, § 30:25, at 234). "'[I]t must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms[.]'" Seventh-Day Adventists, 102 Wn. App. at 494-95 (alterations in original) (quoting 11 WILLISTON & LORD, § 30:25, at 234).

In Seventh-Day Adventists, the court held that a "Trade Contract" "clearly and unequivocally incorporate[d] the 'Contract Project Documents' and the 'Contract Documents'" by stating that work would be performed "in accordance with the 'Project Contract Documents'" and "'in accordance with Contract Documents.'" Seventh-Day Adventists, 102 Wn. App. at 492, 495. Here, like the Trade Contract in Seventh-Day Adventists, the ERA clearly and unequivocally

6

incorporates the Little Book. Specifically, the ERA expressly provides that employees will, on their own initiative, "learn and comply with the rules and policies outlined in our Little Book of Answers." Furthermore, Burnett does not argue that there was any lack of clarity that the Little Book described in the ERA is the same Little Book that he received at orientation. For these reasons, the rules and policies in the Little Book were incorporated by reference into the ERA.

Burnett makes no attempt to distinguish <u>Seventh-Day Adventists</u> even though he cites that case for the proposition that incorporation by reference must be clear and unequivocal. Instead, he argues that "an employment contract telling an employee to read 'on your own time' a separate employment handbook is not 'clear and unequivocal' incorporation by reference." But the ERA not only directs the employee to read the Little Book on his or her own time, it also requires the employee to comply with the rules and policies outlined therein. Therefore, Burnett's argument is not persuasive, and we conclude that an agreement to arbitrate exists here.[6]

*Enforceability of Arbitration Agreement*

Having concluded that the parties agreed to arbitrate, we next consider whether the parties' agreement is enforceable. For the reasons that follow, we conclude that the circumstances surrounding the formation of the parties'

---

[6] Pagliacci argues in the alternative that the Little Book itself created an arbitration agreement regardless of whether it was incorporated into the ERA. Because we conclude that the mandatory arbitration policy was incorporated by reference into the ERA, we do not address Pagliacci's alternative argument here. But because Pagliacci raises that argument again in the context of procedural unconscionability, we address it in the next section.

7

arbitration agreement were procedurally unconscionable and that the mandatory arbitration policy is substantively unconscionable. We also conclude that severance of the substantively unconscionable provisions is inappropriate here and thus hold that the mandatory arbitration policy is unenforceable.[7]

## Procedural Unconscionability

Washington law recognizes two categories of unconscionability: substantive and procedural. Zuver v. Airtouch Commc'ns, Inc., 153 Wn.2d 293, 303, 103 P.3d 753 (2004). "Procedural unconscionability is 'the lack of meaningful choice, considering all the circumstances surrounding the transaction.'" Zuver, 153 Wn.2d at 303 (quoting Nelson v. McGoldrick, 127 Wn.2d 124, 131, 896 P.2d 1258 (1995)). To determine whether an agreement is procedurally unconscionable, we look to the following circumstances surrounding the parties' transaction to determine whether the party claiming unconscionability lacked meaningful choice: (1) the manner in which the contract was entered, (2) whether the party claiming procedural unconscionability had a reasonable opportunity to understand the terms of the contract, and (3) whether the important terms were hidden in a maze of fine print. Zuver, 153 Wn.2d at 303. Our Supreme Court has cautioned that "'these three factors [should] not be applied mechanically without regard to whether in truth a meaningful choice existed.'" Zuver, 153 Wn.2d at 303 (alteration in original) (quoting Nelson, 127

---

[7] Pagliacci suggests that Burnett was required to file a cross appeal to argue that the parties' agreement to arbitrate is unconscionable. But this suggestion has no merit because we can affirm on any basis supported by the record. Bavand v. OneWest Bank, 196 Wn. App. 813, 825, 385 P.3d 233 (2016).

Wn.2d at 131).

Although not determinative, if an agreement constitutes an adhesion contract, that supports a finding that the agreement is procedurally unconscionable. See Zuver, 153 Wn.2d at 305 (analyzing whether an arbitration agreement was an adhesion contract but observing that "the fact that [the] arbitration agreement is an adhesion contract does not end our inquiry"). Washington courts have adopted the following factors to determine whether an adhesion contract exists: "'(1) whether the contract is a standard form printed contract, (2) whether it was prepared by one party and submitted to the other on a 'take it or leave it' basis, and (3) whether there was no true equality of bargaining power between the parties.'" Zuver, 153 Wn.2d at 304 (internal quotation marks omitted) (quoting Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima, 122 Wn.2d 371, 393, 858 P.2d 245 (1993)).

Here, the ERA, including the Little Book and Pagliacci's mandatory arbitration policy, constitutes an adhesion contract. Specifically, the ERA is a standard form printed contract that Burnett was required to sign to begin employment, i.e., on a "take it or leave it" basis. Moreover, Pagliacci does not argue that the ERA is not an adhesion contract. Rather, Pagliacci argues that even if the ERA is an adhesion contract, the circumstances surrounding its formation—and specifically the formation of the parties' agreement to arbitrate— were not procedurally unconscionable. But we disagree.

Mattingly v. Palmer Ridge Homes, LLC, 157 Wn. App. 376, 238 P.3d 505 (2010), is instructive. In Mattingly, Steven and Deborah Mattingly entered an

9

agreement with Palmer Ridge Homes LLC under which Palmer Ridge would construct a custom home for the Mattinglys. Mattingly, 157 Wn. App. at 382. Six months later, the Mattinglys signed an application to enroll in Palmer Ridge's "2-10 Home Buyers Warranty new home warranty program" (2-10 HBW warranty). Mattingly, 157 Wn. App. at 383. As part of the enrollment, the Mattinglys acknowledged that they read a sample copy of the "Warranty Booklet" and understood that their claims and liabilities were limited by the terms and conditions in the booklet. Mattingly, 157 Wn. App. at 383. However, the Mattinglys did not in fact see a copy of the warranty booklet before they signed the enrollment application. Mattingly, 157 Wn. App. at 383.

After discovering problems with the construction of their home, the Mattinglys sued Palmer Ridge. Mattingly, 157 Wn. App. at 386. Palmer Ridge moved for summary judgment, arguing that the Mattinglys' claims were barred by the 2-10 HBW warranty's limitations provisions. Mattingly, 157 Wn. App. at 386. The trial court agreed and dismissed the Mattinglys' claims. Mattingly, 157 Wn. App. at 386.

On appeal, Division Two of this court concluded that the 2-10 HBW warranty limitations were unenforceable. Mattingly, 157 Wn. App. at 392. It held that the circumstances surrounding the 2-10 HBW warranty are "suspect, as there is no evidence in the record that the Mattinglys had a reasonable opportunity to understand the terms contained within the booklet, and the terms remain buried in the booklet." Mattingly, 157 Wn. App. at 392. Specifically, the court observed that the Mattinglys did not receive a sample copy of the booklet

10

before signing the warranty enrollment and that even if the Mattinglys *had* received the booklet, the limitations provisions—though in bold and larger typeface than surrounding text—were on page 7 of a 32-page booklet. Mattingly, 157 Wn. App. at 391-92.

Here, as in Mattingly, the circumstances surrounding the formation of the parties' arbitration agreement are suspect. As in Mattingly, there is no evidence in the record that Burnett had a reasonable opportunity to understand the terms contained in the Little Book—and specifically the mandatory arbitration policy— before he signed the ERA. Instead, the record reflects that Burnett was not afforded an opportunity to review the Little Book before signing the ERA: Burnett testified that he was told to sign the ERA to begin work and instructed to read the Little Book at home. Furthermore, like the warranty limitations in Mattingly, Pagliacci's mandatory arbitration policy is buried in a booklet: Although it is written in plain English, it appears on page 18 of the 23-page Little Book, in the same font size and with the same formatting as surrounding sections. For these reasons, we conclude that Burnett lacked meaningful choice in agreeing to arbitrate, and thus the circumstances surrounding the formation of the parties' arbitration agreement were procedurally unconscionable.

Pagliacci argues that Mattingly is distinguishable because it does not concern an employment relationship. It also points out that while the Mattinglys did not receive the warranty booklet until well after they signed the agreement that incorporated it, the Little Book was reasonably available to Burnett throughout his employment. But the fact that Mattingly was not an employment

11

case is not a relevant distinguishing factor because, as discussed, we apply ordinary contract law to determine the validity of an agreement to arbitrate. McKee, 164 Wn.2d at 383. And it is irrelevant that the mandatory arbitration policy was available to Burnett *after* he signed the ERA if he did not have a reasonable opportunity to review it *before* he signed the ERA into which it was incorporated. Pagliacci's arguments are not persuasive.

Pagliacci also contends that the mandatory arbitration policy is not "'hidden in a maze of fine print'" and that Burnett's failure to read it is not a defense to enforcement. Pagliacci relies on Tjart to support its arguments. But in Tjart, the employee completed an employment application which *itself* contained an arbitration provision. Tjart, 107 Wn. App. at 891-92. Indeed, in concluding that the employee had a reasonable opportunity to understand that she was agreeing to arbitrate her future claims, we observed that "the arbitration provision was obvious in the fairly short contract." Tjart, 107 Wn. App. at 898-99. Here, by contrast, the arbitration policy is not printed—or even *mentioned*—in the ERA itself. Instead, it is buried in a separate booklet that, as discussed, Burnett did not have a reasonable opportunity to review before signing the ERA. Indeed, nothing in the ERA suggests that the Little Book contains an arbitration clause, and even the Little Book's own table of contents describes the section in which the arbitration policy appears as the "Mutual Fairness *Benefits*"[8] section, giving no indication to the reader that it might contain a one-way arbitration clause. Tjart is not persuasive and neither is Pagliacci's argument that the mandatory

---

[8] (Emphasis added.)

arbitration policy is not hidden. Cf. Romney v. Franciscan Med. Grp., 186 Wn. App. 728, 349 P.3d 32 (2015) (holding that arbitration clause was not procedurally unconscionable where employees signed multiple employment contracts that contained the same arbitration agreement addendum).

Pagliacci next argues that the mandatory arbitration policy is not procedurally unconscionable because "the case law shows that an employer can impose new terms of employment on *existing* employees at any time, simply by amending a handbook and giving employees notice that the conditions of their employment have changed." Pagliacci asserts that the Little Book itself was enough to create a binding arbitration agreement even if not incorporated into the ERA, and that Burnett became bound by the mandatory arbitration policy because he received a copy of the Little Book and continued his employment thereafter. Pagliacci chiefly relies on Gaglidari v. Denny's Restaurants, Inc., 117 Wn.2d 426, 815 P.2d 1362 (1991), to support this assertion, but that reliance is misplaced.

In Gaglidari, the plaintiff, Ronda Gaglidari, was hired as a bartender by Denny's Restaurants Inc. (Denny's) in 1980. Gaglidari, 117 Wn.2d at 428. On her first day of work, Gaglidari received a copy of the 1979 employee handbook, which described Denny's termination procedures. Gaglidari, 117 Wn.2d at 428. The handbook stated that "fighting on duty was grounds for immediate dismissal" but provided for counseling review and review by a certain level of manager for infractions not covered by the immediate dismissal provision. Gaglidari, 117 Wn.2d at 428. In 1986, Denny's gave Gaglidari an alcoholic beverage handbook

stating that fighting on company premises, regardless of whether on duty or not, was grounds for immediate dismissal. Gaglidari, 117 Wn.2d at 429, 436.

In 1987, Denny's fired Gaglidari after she was involved in a fight on company premises while off duty. Gaglidari, 117 Wn.2d at 429-30. Gaglidari sued Denny's for failing to comply with the termination procedures in its 1979 employee handbook. Gaglidari, 117 Wn.2d at 430. A jury returned a verdict in Gaglidari's favor. Gaglidari, 117 Wn.2d at 431.

On appeal, our Supreme Court observed that although employment relationships are traditionally terminable at will, "an employment relationship terminable at will can be modified by statements contained in policy manuals or handbooks." Gaglidari, 117 Wn.2d at 433. The court also stated that "[a]n employer may unilaterally amend or revoke policies and procedures established in an employee handbook" but that "an employer's unilateral change in policy will not be effective until employees receive reasonable notice of the change." Gaglidari, 117 Wn.2d at 434. The Supreme Court explained, based on these principles, that the 1979 employee handbook formed a contract pursuant to which Denny's would have been required to follow certain procedures before terminating Gaglidari for fighting while off duty. Gaglidari, 117 Wn.2d at 433. But the court held that the 1986 alcoholic beverage handbook achieved a modification to the 1979 handbook such that on-premises fighting, regardless of duty status, became grounds for immediate dismissal. Gaglidari, 117 Wn.2d at 436. The court then remanded for a new trial on whether Denny's conclusion that Gaglidari was guilty of fighting was reasonable, in good faith, and supported

14

by substantial evidence such that immediate dismissal was warranted. Gaglidari, 117 Wn.2d at 436, 451.

In short, the Gaglidari court considered whether a contract was formed between Denny's and Gaglidari solely to determine what, if any, procedures an *employer* had agreed to follow before terminating an employee and whether the *employer* had complied with those procedures. Gaglidari, 117 Wn.2d at 431. Gaglidari does not, as Pagliacci contends, stand for the proposition that an employee handbook can create an arbitration agreement enforceable by the employer against its employee. Furthermore, Pagliacci cites no Washington authority holding that an employer can foist an arbitration agreement on an employee simply by including an arbitration clause in an employee handbook that is provided to the employee. Therefore, we are not persuaded by Pagliacci's argument that the Little Book created an arbitration agreement merely because Burnett received a copy of it and continued his employment thereafter.

Pagliacci concedes that "[n]o reported Washington decision specifically addresses arbitration policies in the context of employee handbooks" but argues that under Gaglidari, employee handbooks create obligations that are binding on employees and the mandatory arbitration policy should be no exception. Specifically, Pagliacci attempts to analogize the Little Book to the handbook in Gaglidari, which Pagliacci observes "imposed a 'contractual' obligation on the employee not to fight on company premises as a condition of her employment." But this argument ignores the context in which the contract analysis in Gaglidari arose. The Gaglidari court did conclude that Denny's employee handbook, as

15

modified by the alcoholic beverage handbook, created a contract between Gaglidari and Denny's, wherein Gaglidari agreed to abide by the policies and procedures outlined in the handbook. Gaglidari, 117 Wn.2d at 435-36. But as discussed, the court reached this conclusion in the context of determining whether Gaglidari's behavior was grounds for immediate dismissal. An employee's agreement to comply with a policy or risk immediate dismissal is readily distinguishable from an employee's agreement to submit his or her claims to arbitration. That the former agreement can be secured by providing the employee with a handbook does not mean that the latter agreement can be secured in the same manner. Pagliacci's argument is not persuasive.

Pagliacci also relies on Govier v. North Sound Bank, 91 Wn. App. 493, 957 P.2d 811 (1998), to argue that an employer may unilaterally bind its employee to obligations via an employee handbook. Again, its reliance is misplaced. In Govier, the plaintiff, Deborah Govier, was hired by North Sound Bank in 1991 as a loan originator. Govier, 91 Wn. App. at 495. On Govier's first day of work, she received a copy of the bank's personnel handbook, which provided that after Govier reached the end of a 90-day probationary period, she would be considered a "'permanent employee'" and dismissed "'only after a thorough review of the performance record by the supervisor and the President or Vice President.'" Govier, 91 Wn. App. at 495 (emphasis omitted).

In 1993, North Sound Bank presented its loan originators, including Govier, with a new employment agreement. Govier, 91 Wn. App. at 496. The new agreement was for a 1-year period, changed the compensation structure for

loan originators, eliminated sick leave and holiday and vacation pay, and allowed either party to terminate on 20 days' written notice. Govier, 91 Wn. App. at 496-97. Loan originators were directed to sign the new employment agreement or be terminated. Govier, 91 Wn. App. at 496. Govier, who was unhappy with the new terms, refused to sign the agreement and consequently was terminated. Govier, 91 Wn. App. at 497.

Govier sued, alleging that North Sound Bank had breached the employment contract embodied in the original personnel handbook. Govier, 91 Wn. App. at 497. Division Two of this court disagreed, holding that the personnel handbook had the force of a unilateral contract, i.e., "one in which the promisor does not receive a promise in return as consideration." Govier, 91 Wn. App. at 499. It recognized that in the handbook context, an employer that promises specific treatment in specific situations can revoke or modify those promises without mutual assent. Govier, 91 Wn. App. at 500. The court thus held that by receiving a new agreement changing the duration of her employment from indefinite to one year and eliminating other benefits, Govier could no longer enforce the former handbook terms against the bank. Govier, 91 Wn. App. at 501-02.

Like the Gaglidari court, the Govier court conducted its analysis in the context of determining whether an employer was bound by the promises it made to its employee. But as discussed, that is not the case here, where Pagliacci seeks to bind its employee. Neither Govier nor Gaglidari supports Pagliacci's argument that because an arbitration clause appeared in an employee handbook

17

that was provided to Burnett, the parties' arbitration agreement is procedurally conscionable.

Pagliacci next observes that "[n]umerous state and federal courts have found binding agreements to arbitrate based on employee handbooks," citing—without discussion—to a number of federal and out-of-state cases. These cases are not binding, and we decline to address them.

Because we hold that Pagliacci's mandatory arbitration policy is procedurally unconscionable, we must next address Burnett's argument that procedural unconscionability alone is sufficient to render Pagliacci's mandatory arbitration policy unenforceable. He relies on Gandee v. LDL Freedom Enterprises, Inc., 176 Wn.2d 598, 603, 293 P.3d 1197 (2013), for the proposition that "either substantive or procedural unconscionability is sufficient to void a contract." Although Pagliacci does not argue otherwise, we note that this proposition, while accurately excerpted from Gandee, is not a complete statement of the law. Specifically, the Gandee court cited Adler v. Fred Lind Manor, 153 Wn.2d 331, 347, 103 P.3d 773 (2004), but in Adler, the Supreme Court expressly reserved ruling on whether procedural unconscionability—as opposed to substantive unconscionability—alone is sufficient to void a contract. Adler, 153 Wn.2d at 346-47. And in Gandee, only substantive unconscionability was alleged. Gandee, 176 Wn.2d at 603.

That said, both Division Two and Division Three of this court have invalidated agreements based on procedural unconscionability alone. Specifically, in Mattingly, discussed above, Division Two invalidated the 2-10

18

HBW warranty limitations based solely on its conclusion that the circumstances surrounding the warranty's formation were procedurally unconscionable. Mattingly, 157 Wn. App. at 392. And in Gorden v. Lloyd Ward & Associates, PC, 180 Wn. App. 552, 323 P.3d 1074 (2014), Division Three invalidated an arbitration agreement based solely on procedural unconscionability.

Furthermore, and as discussed, Burnett was not afforded an opportunity to review the Little Book before signing the agreement into which it was incorporated. Indeed, even the ERA itself states that the employee "[o]n your own initiative . . . will learn . . . the rules and policies outlined in our Little Book of Answers,"[9] suggesting that employees are not expected to have had an opportunity to fully comprehend the Little Book's contents *before* signing the ERA. And as discussed, the ERA does not even mention the arbitration policy, which is buried toward the end of the Little Book. In short, it is apparent from this record that Burnett lacked meaningful choice in agreeing to arbitrate. Therefore, we hold that procedural unconscionability alone renders Pagliacci's mandatory arbitration policy unenforceable.

Finally, and although not necessary to our conclusion that procedural unconscionability alone renders Pagliacci's mandatory arbitration policy void, we observe that Pagliacci's mandatory arbitration policy requires employees to arbitrate discrimination, unlawful termination, and wage-related claims, which include claims with respect to which employees have a statutory right to maintain a civil action. See, e.g., RCW 49.60.030(2) (providing that any person deeming

---

[9] (Emphasis added.)

19

himself or herself injured by a violation of the Washington State Civil Rights Act "shall have a civil action in a court of competent jurisdiction"); RCW 49.52.070 (providing that any employer that willfully deprives an employee of any part of his or her wages "shall be liable in a civil action by the aggrieved employee"). And although not addressed by either party, waiver requires "an intentional and voluntary relinquishment of a known right." Jones v. Best, 134 Wn.2d 232, 241, 950 P.2d 1 (1998). Here, as discussed, Burnett did not have a reasonable opportunity to understand that he was agreeing to arbitrate—much less to understand the types of claims he was agreeing to arbitrate or to intentionally and voluntarily relinquish his right to pursue those claims in court. Therefore, we are very skeptical that under the circumstances presented here, Burnett effectively waived any statutorily conferred right to maintain a civil action.

## Substantive Unconscionability

"'Substantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh.'" Zuver, 153 Wn.2d at 303 (quoting Schroeder v. Fageol Motors, Inc., 86 Wn.2d 256, 260, 544 P.2d 20 (1975)). "'Shocking to the conscience', 'monstrously harsh', and 'exceedingly calloused' are terms sometimes used to define substantive unconscionability." Nelson, 127 Wn.2d at 131 (quoting Montgomery Ward & Co. v. Annuity Bd. of S. Baptist Convention, 16 Wn. App. 439, 444, 556 P.2d 552 (1976)).

Here, Burnett argues that Pagliacci's mandatory arbitration policy is substantively unconscionable because (1) it requires employees, but not

Pagliacci, to submit certain claims to arbitration and (2) the F.A.I.R. Policy, which is a prerequisite to arbitration, contains a limitations provision that is overly harsh. Although we disagree that the mandatory arbitration policy is substantively unconscionable merely because its arbitration requirement is not mutual, we agree that the F.A.I.R. Policy's overly harsh limitations provision renders the mandatory arbitration substantively unconscionable.

Zuver is instructive here. There, the court evaluated an employment arbitration agreement that included: (1) a confidentiality provision stating that all arbitration proceedings, including settlements and awards, would be confidential and (2) a remedy limitations provision under which the employee waived the right to seek punitive damages. Zuver, 153 Wn.2d at 298-99. Our Supreme Court held that these provisions were substantively unconscionable. Specifically, the court concluded that the confidentiality provision was substantively unconscionable because it "hampers an employee's ability to prove a pattern of discrimination or to take advantage of findings in past arbitrations." Zuver, 153 Wn.2d at 315. Additionally, "keeping past findings secret undermines an employee's confidence in the fairness and honesty of the arbitration process," potentially discouraging employees from pursuing valid discrimination claims. Zuver, 153 Wn.2d at 315. The court also concluded that the remedies limitation provision was substantively unconscionable because the provision "blatantly and excessively favors the employer" by barring the employee from collecting punitive or exemplary damages while allowing the employer to collect such damages in its claims against the employee. Zuver, 153 Wn.2d at 318.

21

In discussing the remedies limitation provision, the Zuver court also expressly rejected the concurrence/dissent's assertion that the plaintiff in Zuver was "seeking invalidity based simply on a lack of mutuality of obligations." Zuver, 153 Wn.2d at 317 n.16. The court instead explained that the plaintiff was *not* complaining about mere lack of mutuality and stated, "[W]e are not concerned here with whether the parties have mirror obligations under the agreement, but rather whether the *effect* of the provision is so 'one-sided' as to render it patently 'overly harsh' in this case." Zuver, 153 Wn.2d at 317 n.16 (emphasis added) (quoting Schroeder, 86 Wn.2d at 260).

In short, the Zuver court's analysis demonstrates that arbitration agreements are not substantively unconscionable merely because they are not mutual. Therefore, we reject Burnett's argument that Pagliacci's mandatory arbitration policy is substantively unconscionable merely because it requires Burnett, but not Pagliacci, to arbitrate certain claims. Cf. Tjart, 107 Wn. App. at 901 (explaining that by agreeing to arbitrate, party does not give up substantive right but only the ability to raise it in court).

But Zuver also demonstrates that nonmutual provisions in an arbitration agreement are substantively unconscionable when, like the confidentiality and remedies limitations provisions in Zuver, they have the effect of limiting an employee's ability to access substantive remedies or discouraging an employee from pursuing valid claims. To that end, we conclude for the reasons that follow that the mandatory arbitration policy is substantively unconscionable because the F.A.I.R. Policy, which is a prerequisite to arbitration, contains a limitations

22

provision that is substantively unconscionable.

First, as Burnett points out, the limitations provision "effectively shortens the statute of limitations for any claim by an employee who no longer works for [Pagliacci]" because a terminated employee has no way to "[i]nformally report the matter and all details to your supervisor," as required by the F.A.I.R. Policy's Supervisor Review procedure. In other words, the limitations provision acts as a complete bar to arbitration and suit for employees who do not become aware that they have a potential claim until after their employment with Pagliacci ends. Such a bar "blatantly and excessively favors" Pagliacci and is substantively unconscionable. Zuver, 153 Wn.2d at 318-19.

Pagliacci argues that "[t]he only reasonable interpretation of the F.A.I.R. policy is that it is intended to apply to current employees" and not to former employees. But Pagliacci's proffered interpretation would require us to read into the F.A.I.R. Policy an exception that is not expressed therein. Pagliacci's proffered interpretation also contradicts the F.A.I.R. Policy's unambiguous limitations provision, which states: "If you do not comply with a step, rule or procedure in the F.A.I.R. Policy with respect to a claim, you waive any right to raise the claim in any court or other forum, including arbitration." We are not persuaded by Pagliacci's liberal interpretation of this limitations provision, which Pagliacci itself drafted in unambiguous terms.[10] Cf. Sales Creators, Inc. v. Little

---

[10] Indeed, Pagliacci itself pointed out below that Burnett "never requested resolution via Pagliacci's internal F.A.I.R. Policy," suggesting that even Pagliacci believed at one time that the F.A.I.R. Policy applied to terminated employees like Burnett.

23

Loan Shoppe, LLC, 150 Wn. App. 527, 531, 208 P.3d 1133 (2009) ("In interpreting an arbitration clause, the intentions of the parties *as expressed in the contract* control.") (emphasis added).

Next, although not raised by Burnett, the limitations provision not only bars claims for terminated employees, but also effectively shortens the time period for *any* employee to assert claims against Pagliacci. Specifically, the F.A.I.R. Policy's limitations provision prohibits an employee from commencing arbitration (or filing suit) until he or she has fully complied with the policy's steps and procedures. And "a claim sought to be arbitrated is subject to the same limitations of time for the commencement of actions as if the claim had been asserted in a court." RCW 7.04A.090(3). Therefore, the F.A.I.R. Policy's limitations provision has the effect of shortening, by whatever time it takes to complete the procedures set out in the F.A.I.R. Policy, the period during which employees may assert their claims under Pagliacci's two-step arbitration policy.

To this end, our Supreme Court has repeatedly held that arbitration provisions that contain unreasonable contractual limitations periods are substantively unconscionable. For example, in Adler, the court held that an arbitration agreement's 180-day limitations period was substantively unconscionable because it provided the employer with unfair advantages. Adler, 153 Wn.2d at 357. Specifically, the Adler court observed that the limitations period could require employees to forgo the opportunity to file discrimination complaints with and have them investigated by the Equal Employment Opportunity Commission or the Washington Human Rights Commission. Adler,

24

153 Wn.2d at 357. The limitations period in Adler also deprived employees of continuing violation and tolling doctrines under federal and state discrimination laws. Adler, 153 Wn.2d at 356-57. In Gandee, the court held that a provision shortening the statute of limitations from the 4 years provided by the Consumer Protection Act[11] to 30 days was substantively unconscionable. Gandee, 176 Wn.2d at 607. And in Hill v. Garda CL Northwest, Inc., 179 Wn.2d 47, 55, 308 P.3d 635 (2013), the court concluded that an arbitration clause's 14-day limitations provision was substantively unconscionable where employees would otherwise have a 3-year period to bring the type of claims contemplated.

Here, the mandatory arbitration policy does not contain a specified limitations period. But because the time required for F.A.I.R. Policy compliance is entirely indeterminate, it—like the contractual limitations periods in Adler, Gandee, and Hill—is substantively unconscionable because it provides Pagliacci with unfair advantages. Specifically, and as discussed, the F.A.I.R. Policy, which is a prerequisite to arbitration, acts as a complete bar to arbitration unless an employee has "fully complied with the steps and procedures in the F.A.I.R. Policy." Therefore, an employee must anticipate and build in time to fully comply with the F.A.I.R. Policy before the applicable limitations period expires. But the time required for compliance is not within the employee's control. Under the F.A.I.R. Policy, Pagliacci makes no commitment to address disputes or schedule nonbinding conciliation within a specified period of time after the employee has reported the matter or initiated conciliation. Nor does the policy provide any

---

[11] Chapter 19.86 RCW.

"release valve" that allows employees to commence arbitration if conciliation under the F.A.I.R. Policy takes more than a specified amount of time, or if the applicable statute of limitations is set to expire while the employee is attempting to comply with the F.A.I.R. Policy. Indeed, the F.A.I.R. Policy's limitations provision provides just the opposite: Regardless of how long the conciliation procedure takes, the bar to arbitration "shall not be subject to tolling, equitable or otherwise."

Finally, Pagliacci does not dispute that the F.A.I.R. Policy contains no exception to Supervisor Review even when the employee's supervisor is the person subjecting the employee to unfair conduct or harassment. In such cases, Supervisor Review, like the confidentiality provision in Zuver, "undermines an employee's confidence in the fairness and honesty of the arbitration process and thus potentially discourages that employee from pursuing a valid . . . claim." Zuver, 153 Wn.2d at 315.

For these reasons and because full compliance with the F.A.I.R. Policy is a prerequisite to arbitration, the limitations provision in the F.A.I.R. Policy renders the mandatory arbitration policy substantively unconscionable.[12]

Pagliacci argues that its mandatory arbitration policy is not substantively unconscionable because it does not contain any of the specific types of

---

[12] Burnett also argues that the mandatory arbitration policy is substantively unconscionable because (1) the procedure prescribed by the F.A.I.R. Policy conflicts with the ERA and (2) Pagliacci reserves for itself a unilateral right to amend the Little Book (and therefore the mandatory arbitration policy). But because we conclude that the mandatory arbitration policy is substantively unconscionable on other grounds, we do not consider these arguments.

provisions that our Supreme Court has found to be substantively unconscionable, such as contractual limitations periods, fee-splitting requirements, or limitations on the amount or types of damages recoverable. But we are not limited by the specific types of provisions that the Supreme Court has already deemed substantively unconscionable. Rather, our inquiry is whether the effect of Pagliacci's two-step mandatory arbitration policy is "so one-sided and harsh that it is substantively unconscionable." Zuver, 153 Wn.2d at 318. For the reasons discussed, we conclude that it is.

### Severance

As a final matter, Pagliacci argues that even if the mandatory arbitration policy is substantively unconscionable due to the F.A.I.R. Policy's limitations provision, the F.A.I.R. Policy must be severed from the mandatory arbitration policy, leaving the agreement to arbitrate intact. We disagree.

"'Severance is the usual remedy for substantively unconscionable terms, but where such terms pervade an arbitration agreement, [this court] refuse[s] to sever those provisions and declare[s] the entire agreement void.'" Woodward v. Emeritus Corp., 192 Wn. App. 584, 602, 368 P.3d 487 (2016) (alterations in original) (quoting Gandee, 176 Wn.2d at 603). "Stated differently, when severance will 'significantly alter both the tone of the arbitration clause and the nature of the arbitration contemplated by the clause,' the appropriate remedy is to invalidate the entire agreement." Woodward, 192 Wn. App. at 602 (quoting Gandee, 176 Wn.2d at 607). Nevertheless, severance cannot cure the procedural deficiencies concerning the formation of an arbitration agreement.

Gorden, 180 Wn. App. at 565.

Here, Pagliacci's mandatory arbitration policy is both substantively *and* procedurally unconscionable, so severance is inappropriate. Cf. Adler, 153 Wn.2d at 350 n.9, 351 (remanding to trial court for further proceedings regarding procedural unconscionability and noting that if the employee proved his procedural unconscionability claim on remand, "the arbitration agreement would be void").

Pagliacci chiefly relies on Zuver to argue that severance is required here, but that reliance is misplaced. In Zuver, the court did sever the substantively unconscionable terms from the arbitration agreement. Zuver, 153 Wn.2d at 320-21. But Zuver is distinguishable because there, the court concluded that the arbitration agreement in question was not procedurally unconscionable. Zuver, 153 Wn.2d at 306. Additionally, the Zuver court relied in part on the fact that the parties' arbitration agreement contained a severability clause. Zuver, 153 Wn.2d at 320. Here, severance cannot cure the arbitration policy's procedural deficiencies, and there is no severability clause in the ERA. Therefore, Zuver does not require severance.

We affirm.

WE CONCUR: